949 P.2d 1291 (1997)
133 Wash.2d 894
WASHINGTON STATE COALITION FOR THE HOMELESS; Anita Elliott and her minor child, Justin, through his guardian ad litem, Anita Elliott; Stanley and Marie Hill, and their minor children, Bayyinah, Aqila, Stanley, Tamika and Habibah, through their guardians ad litem, Stanley and Marie Hill; Kerry Coughlin and her minor children, J.C.,
J.V. and L.V., through their guardian ad litem, Bradford Kinsey; Elizabeth Sanders and her minor children, A.S., E.S. and S.S., through their guardian ad litem, Elizabeth Sanders; and other persons similarly situated; Respondents,
v.
DEPARTMENT OF SOCIAL AND HEALTH SERVICES; and Richard Thompson, in his official capacity as Secretary of the Department of Social and Health Services; and their successors, Appellants.
No. 62879-3.
Supreme Court of Washington.
Argued October 8, 1996.
Decided December 24, 1997.
*1295 Christine Gregoire, Atty. Gen., Michael Collins, Trisha McArdle, Asst. Attys. Gen., for Appellants.
Lori Salzarulo of Garvey, Thompson & Howel, Schubert & Barer, Seattle; Carol Vaughn, Seattle, Michael Mirra, Columbia Legal Services, Tacoma, for Respondents.
Anne D. Rees, Jill Reinmuth, Seattle, amicus curiae for Alliance for Children Youth, et al. *1292 *1293
*1294 GUY, Justice.
The primary issue in this appeal is whether the Department of Social and Health Services has an enforceable duty, under RCW 74.13.031(1), to develop and implement a comprehensive and coordinated plan for providing services to this state's homeless children. This appeal also raises questions regarding the existence and scope of any statutory or constitutional duty the Department may have to provide housing assistance to homeless families whose children are placed in foster care primarily because of inadequate housing.
We hold that the duties set forth by the Legislature in RCW 74.13.031(1) are clear and are mandatory. The statute requires the Department to provide child welfare services and to "[d]evelop, administer, supervise, and monitor a coordinated and comprehensive plan that establishes, aids, and strengthens services for the protection and care of homeless, runaway, dependent, or neglected children." The Department has not complied with this statute insofar as homeless children are concerned. We also hold that implicit in the dependency statute, RCW 13.34, is a grant of authority to the trial court to order the Department to provide some form of housing assistance in any case in which homelessness is a primary factor in the decision to place or to keep a child in foster care. The form of assistance may vary, depending on the needs of the family, the resources of the Department, and the availability of public and private aid in the community. This assistance could take many forms. For example, it could include helping a family to find affordable housing by offering transportation, consultation, referrals or assistance in filling out forms; or waiving foster care payments in order to make housing funds available to the family; or providing those funds, when available through the Department; or obtaining housing or assistance from federal, state, local or private agencies. We reject the plaintiffs' arguments that federal statutes provide a private right of action against the State and, because we resolve the case on state statutory grounds, we decline to decide the constitutional issues raised by the plaintiffs.

FACTS
It is undisputed by the parties that homelessness is a serious, widespread problem in *1296 our state and that it has a devastating effect on children.
The stipulated facts and the unchallenged findings of fact in this case show the following:
 The majority of Washington's homeless are families with small children.
 In fiscal year 1990, 171,000 homeless persons in Washington sought emergency shelter. Approximately 115,000, including an estimated 37,000 children, were turned away from shelter due to lack of space.
 In fiscal year 1991, of the people who were admitted to emergency shelters, approximately 7,900 were families with 17,200 minor children. Of those children, 75 percent (more than 12,000 children) were under the age of 11 years. During this same period of time approximately 23,500 families, with 49,800 children, were turned away from shelters because of lack of space.
 These figures estimating the number of homeless persons in Washington are conservative.
 As low cost private housing has disappeared, the number of families who are homeless has increased. Homeless families with children are in every county of Washington State.
 Homelessness has significant adverse effects upon the growth and development of children.

PROCEDURAL HISTORY
This action was filed in 1991 against the Department of Social and Health Services and its Secretary (hereafter referred to collectively as DSHS or Department) on behalf of the class of children and their parents living in Washington who are homeless or who are threatened with becoming homeless.
The plaintiffs are the Washington State Coalition for the Homeless, an association of agencies and organizations which provide shelter and other services to homeless families with children and which advocate on behalf of the homeless, and certain named individual homeless children and their parents who represent the certified class.[1]
In its complaint, the Homeless Coalition alleges that actions and failures to act on the part of DSHS toward homeless children and their families violate state and federal statutes and state and federal constitutional provisions. The complaint seeks declaratory and injunctive relief, as well as compensatory damages.
Both parties appeal from three separate orders entered by the trial court over a three-year period. DSHS appeals from an order declaring that the Department is mandated by RCW 74.13.031(1) to develop, administer, supervise, and monitor a coordinated and comprehensive plan that establishes, aids and strengthens services for homeless children. DSHS also appeals the trial court's determination that the Department failed to comply with RCW 74.13.031(1). Finally, DSHS appeals the trial court's ruling that a juvenile court hearing a dependency case may require DSHS to provide some form of housing assistance if homelessness is the primary reason for foster placement or the primary factor preventing reunification of the family.
The Coalition cross-appeals from an order dismissing its claims for relief based on federal law and federal and state constitutional provisions, and appeals the order which limits the circumstances under which a dependency court may order DSHS to provide housing assistance.
An amicus curiae brief was filed in support of the Coalition's position by the Alliance for Children, Youth, and Families; the American Academy of Pediatrics; the Church Council of Greater Seattle; the Northwest Women's Law Center; the Washington Academy of Family Physicians; the Washington Association of Churches; the Washington State Psychological Association; and YouthCare.
We granted direct review and now affirm the trial court.

ISSUES
1. Does RCW 74.13.031(1) require the Department of Social and Health Services to *1297 create and implement a coordinated and comprehensive plan for providing services to this state's homeless children?
2. If RCW 74.13.031(1) does create such a duty, has DSHS complied with the statutory mandate?
3. Do RCW 13.34 and RCW 74.13 authorize the judiciary to order DSHS to provide housing assistance in order to prevent or shorten foster care placements?
4. Are the provisions of the Adoption Assistance and Child Welfare Act of 1980 enforceable in a private action?
5. Do homeless children who are threatened with foster care placement have a federal or state constitutional right to housing assistance as the least restrictive alternative to an out-of-home placement?

ANALYSIS

1. Interpretation of RCW 74.13.031(1)
RCW 74.13.031 provides:
The department [of Social and Health Services] shall have the duty to provide child welfare services as defined in RCW 74.13.020, and shall:
(1) Develop, administer, supervise, and monitor a coordinated and comprehensive plan that establishes, aids, and strengthens services for the protection and care of homeless, runaway, dependent, or neglected children.
The first issue is whether this statute requires DSHS to develop and implement a plan for providing services to homeless children. This issue is one of statutory interpretation and our review is de novo. See Rettkowski v. Department of Ecology, 128 Wash.2d 508, 514-15, 910 P.2d 462 (1996). The duty of the court in interpreting a statute is to ascertain and give effect to the intent and purpose of the Legislature, as expressed in the statute as a whole. See Tommy P. v. Board of County Comm'rs, 97 Wash.2d 385, 391, 645 P.2d 697 (1982). If a statute is unambiguous, its meaning is to be derived from the language of the statute alone. See Geschwind v. Flanagan, 121 Wash.2d 833, 841, 854 P.2d 1061 (1993); Cherry v. Municipality of Metro. Seattle, 116 Wash.2d 794, 799, 808 P.2d 746 (1991). An unambiguous statute is not subject to judicial construction, and we will not add language to a clear statute even if we believe the Legislature intended something else but failed to express it adequately. See Geschwind, 121 Wash.2d at 841, 854 P.2d 1061; Adams v. Department of Soc. & Health Servs., 38 Wash.App. 13, 16, 683 P.2d 1133 (1984).
The Department argues that the statute is unclear, thus requiring this court's construction, in part because the word "homeless" is ambiguous. The Department's contention is that "homeless" children, as used in the statute, refers only to those children who have no family and no home and who, because of their status as orphans, would, therefore, fit within the definition of "dependent" children.
RCW 74.13 does not define "homeless" children. In the absence of a specific statutory definition, words used in a statute are given their ordinary meaning. See State v. Alvarez, 128 Wash.2d 1, 11, 904 P.2d 754 (1995); State v. Smith, 117 Wash.2d 263, 271, 814 P.2d 652 (1991). A nontechnical word may be given its dictionary meaning. See State v. Fjermestad, 114 Wash.2d 828, 835, 791 P.2d 897 (1990).
The dictionary defines "homeless" as "having no home or permanent place of residence." See WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1083 (1986). This definition is consistent with the definition agreed upon by the Governor's Task Force on Homelessness. "The term `homeless' or `homeless individual' includes a person or persons who lack a fixed, regular, and adequate nighttime residence." See Governor's Task Force on Homelessness, REPORT TO THE GOVERNOR 11 (1990). It also is consistent with the definition used by the State Advisory Council on Homelessness in its 1993 Progress Report. "Homeless people in Washington State continue to represent a broad variety of people. As in 1990, the majority of Washington's homeless people are families with children." See State Advisory Council on Homelessness, State Dep't of Community Dev., STATE ACTION AGENDA TO END HOMELESSNESS: A PROGRESS REPORT 7 (1993). It is consistent with the Legislature's *1298 definition of "homeless" in other Washington statutes. See, e.g., RCW 84.36.043(2)(a) (defining "homeless" for purposes of revenue statutes as "persons, including families, who, on one particular day or night, do not have decent and safe shelter nor sufficient funds to purchase or rent a place to stay"). Furthermore, it is consistent with the Department's own definition of homeless as set forth in its regulations governing food assistance programs. See WAC 388-49-020(37) ("`[h]omeless individual' means a person lacking a fixed and regular nighttime residence or a person whose primary nighttime residence is" a supervised shelter, halfway house, temporary residence with others, or place not ordinarily used as sleeping accommodations for humans).
A word which is not defined in a statute, but which has a well-accepted, ordinary meaning, is not ambiguous. See Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 814, 828 P.2d 549 (1992). The well-accepted, ordinary meaning of the word "homeless" is "having no home or permanent place of residence," not, as the Department contends, "without family." "Homeless," as used in RCW 74.13.031(1), is not ambiguous.
The Department also argues that the term "child welfare services" is ambiguous.
The statute itself defines "child welfare services" in RCW 74.13.020, which provides in pertinent part:
As used in Title 74 RCW, child welfare services shall be defined as public social services ... which strengthen, supplement, or substitute for, parental care and supervision for the purpose of:
....
(2) Protecting and caring for homeless, dependent, or neglected children;
....
(4) Protecting and promoting the welfare of children, including the strengthening of their own homes where possible, or, where needed[.]
We agree with the Department that the statutory definition of "child welfare services" is broad and does not create an individual right to a specific kind of service. See In re Welfare of J.H., 75 Wash.App. 887, 880 P.2d 1030 (1994) (definition of child welfare services contained in RCW 74.13.020(2) imposes a general duty and does not give rise to individual enforceable rights to a particular kind of service). However, a statute is not ambiguous merely because it states a duty in general terms and provides an agency discretion to determine the ways in which the duty may be met.
The Department further argues that the definition of child welfare services is no more than a policy statement of the goals of this child welfare statute. We disagree. The statute sets forth, in a separate section, the policy and the goals of the enactment. The policy section provides:
The purpose of this chapter is to safeguard, protect and contribute to the welfare of the children of the state, through a comprehensive and coordinated program of public child welfare services providing for: Social services and facilities for children who require guidance, care, control, protection, treatment or rehabilitation; setting of standards for social services and facilities for children; cooperation with public and voluntary agencies, organizations, and citizen groups in the development and coordination of programs and activities in behalf of children; and promotion of community conditions and resources that help parents to discharge their responsibilities for the care, development and well-being of their children.
RCW 74.13.010.
The Legislature stated its policy and the goals it hoped RCW 74.13 would achieve in RCW 74.13.010. The Legislature expressly states that it is defining the term "child welfare services" in RCW 74.13.020. We cannot ignore this clear statutory language and we will not strain to find an ambiguity where the language of the statute is clear. See Geschwind, 121 Wash.2d at 841, 854 P.2d 1061.
We therefore turn to the language of the statute to determine the intent of the Legislature and the meaning of the statute.
By using the word "shall," RCW 74.13.031(1) imposes a mandatory duty. See Waste Management of Seattle, Inc. v. *1299 Utilities & Transp. Comm'n, 123 Wash.2d 621, 629, 869 P.2d 1034 (1994); Cascade Vista Convalescent Ctr., Inc. v. Department of Soc. & Health Servs., 61 Wash.App. 630, 638, 812 P.2d 104 (1991). The duty imposed by RCW 74.13.031(1) is clearly announced in the statute. Under the plain language of the statute, DSHS is required to provide child welfare services and is required to "[d]evelop, administer, supervise, and monitor a coordinated and comprehensive plan that establishes, aids, and strengthens services for the protection and care of homeless, runaway, dependent, or neglected children." Because the statute specifically refers to homeless children, we do not read the law as limiting the Department's duty only to "dependent" children.

2. Department's Compliance with RCW 74.13.031(1)
We next determine whether the Department has accomplished the mandate of RCW 74.13.031(1) as it relates to homeless children.
At trial on this issue, the Department took the position that two agency documents constituted the only plan required by RCW 74.13.031(1).
The first document, the "State of Washington Child Welfare Plan, FY 1994-1997," Exhibit 1, describes the Department's programs and goals with respect to child welfare services. This document was prepared solely for the purpose of complying with the requirements of federal law, as a prerequisite to the state receiving federal funding. The Department argues that because this plan was approved by the federal government, it satisfies the requirements of state law. However, minimal compliance with federal standards relating to children who are placed in foster care does not satisfy the requirement of RCW 74.13.031(1) as it relates to homeless children. The unrefuted testimony at trial showed that DSHS did not take advantage of federally funded programs that could aid homeless children. The Department did not challenge the trial court's finding of fact that
DSHS has made only very limited use of the options available under federal law for employing the programs under Title IV-A of the Social Security Act (AFDC Program, Emergency Assistance Program and AFDC Special Needs Program/Additional Requirements) for targeting and providing assistance to homeless children and families. Through these programs DSHS could provide additional money for housing[.]
Clerk's Papers at 1248-49. According to the Department's own witnesses, the programs described in Exhibit 1 would have only an incidental effect on children of homeless families because a homeless child would have to be at risk of abuse or neglect in order to qualify for the programs outlined in the document.
The Department's second document, entitled "Comprehensive Plan to Coordinate Services for Homeless Children and Families" (hereafter Plan), Exhibit 5, was drafted in response to the present lawsuit. Department employees who drafted the Plan were directed by the Secretary of DSHS to develop a plan that would list preexisting services and proposed enhancements, which could be made available within existing structures, to those services.
Each of the expert witnesses appearing on behalf of the plaintiffs testified with respect to the steps that would have to be taken in developing a coordinated and comprehensive plan and with respect to the essential elements that an adequate plan would include.[2] *1300 The testimony of these experts was not rebutted or refuted by the Department.
Based on the expert testimony, the trial court made a finding of fact that the necessary steps to develop an effective plan included (1) a recognition and acknowledgment by DSHS of its role; (2) coordination within DSHS itself and, most critically, coordination by DSHS with other agencies of state and federal government and other groups such as shelter providers and social service providers; (3) consultation with experts and others; and (4) data collection and analysis and a process for on-going evaluation. This finding is not challenged by the Department.
The Department's witnesses testified that in drafting the plan they did not follow the steps outlined by the plaintiffs' expert witnesses.
The plaintiffs' experts also were consistent in their opinions that, to be effective, any plan developed by DSHS would have to address (1) prevention services, (2) adequate emergency programs, and (3) programs to assist families to obtain affordable housing. This testimony was not rebutted by the Department. The trial court entered a finding of fact that reflected the testimony of the experts in this regard. This finding of fact is not challenged by the Department.
The Department's Plan, Exhibit 5, identifies existing services and programs which are primarily for abused and neglected children, along with some proposed enhancements that address the needs of homeless families with children. One of the proposed enhancements would be to aid parents of homeless children, in those instances where the parents are receiving Aid to Families with Dependent Children (AFDC) and where the children are determined to be at risk and are removed from the family home and placed in foster care.[3] DSHS does not place children in foster care solely on the basis of homelessness. This proposed enhancement would therefore be available only to children who are at risk of abuse or neglect. For some homeless children who fall within this category, the Department's proposed enhancement would mean an earlier return to parental care. The testimony at trial was that as many as 40 percent of homeless families do not qualify for AFDC funds. Those who do qualify receive 47 percent of the standard of need.[4]
The Department's plan also proposed, as an enhancement to existing services, coordination of community resources. The Department's proposal in this regard is described by the trial court in an unchallenged finding of fact, as follows:
Although, DSHS has begun in Exhibit 5 to recognize the need to coordinate with other agencies, it has proposed to do so in an extremely limited fashion that will have little impact. The only coordination that has been proposed by DSHS is development of a community resource manual; a proposal to seek interagency agreements with state and federal agencies and local housing authorities; and a proposal to "reinforce links" between the service providers within DSHS. Exhibit 5 is not a coordinated or comprehensive plan that addresses the needs and care of homeless children.
Clerk's Papers at 1251-52.
The Department also does not assign error to the trial court's finding of fact that
State agencies have not coordinated their services or their goals concerning homeless families and their children. There is no plan that coordinates the services provided at the state level. At the local level, there is no effort to coordinate with non-profit providers that serve homeless families. It is a very fragmented system. This is dramatically illustrated by the admitted lack *1301 of coordination between DSHS and the Department of Community, Trade and Economic Development (hereinafter, "DCD"). DCD is the state agency that receives funding to provide housing and housing assistance. Although the state's two major witnesses at trial ... both testified that it would be important and necessary to coordinate with DCD, they both acknowledged that had not been done except informally at the field level.
Clerk's Papers at 1252.
We agree with the trial court's conclusion that the Plan submitted by the Department in this case is not a comprehensive and coordinated plan that establishes, aids or strengthens services for the protection and care of this state's homeless children. The Department has not attempted to develop the plan required by the statute insofar as homeless children are concerned.
While the Department is afforded discretion under the statute in developing the plan required, it must comply with the clear language of the statute when it exercises that discretion, and it cannot ignore a class of children which the Legislature has stated must be protected. In exercising its discretion, DSHS should follow the accepted method of developing a plan and should address the apparent needs of the children who are the subject of the plan.
The Department argues that this court should not determine the meaning of the statute in this case because the plaintiffs' claims based on RCW 74.13 should have been dismissed on the pleadings since the statute does not create a right in plaintiffs to enforce the statute.
Where the Legislature enacts a statute that grants rights to an identifiable class, there is an assumption that those rights are enforceable. See Bennett v. Hardy, 113 Wash.2d 912, 919-20, 784 P.2d 1258 (1990). In Bennett, 113 Wash.2d at 920-21, 784 P.2d 1258, we held that in determining whether a cause of action exists, the court must consider: (1) whether the plaintiffs are within the class of persons for whose benefit the statute was enacted; (2) whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and (3) whether implying a remedy is consistent with the underlying purpose of the legislation.
Plaintiffs, the class of children and their families who are homeless, are within the class of persons intended to benefit from this statute. We find nothing in the statute that would deny plaintiffs an injunctive and declaratory remedy requiring compliance with the statute. Permitting the plaintiffs to bring an action to enforce the statute through an injunction action and pursuant to the Uniform Declaratory Judgments Act is consistent with the underlying purpose of the statute.
We hold that plaintiffs have a right to bring a declaratory action and an action to enforce the mandate of RCW 74.13.031(1).
The Department next argues that enactment of RCW 43.330, which creates the Department of Community, Trade, and Economic Development and authorizes that agency to oversee the housing trust fund, RCW 43.185, relieves DSHS of its responsibility to create a child welfare services plan for homeless children.
DSHS cites to no relevant authority, and we find none, which supports its argument that the enactment of other laws to aid this state's homeless population relieves DSHS of its duty to comply with RCW 74.13.031(1).
DSHS further argues that the trial court had no authority to interfere with the discretion of the Department in its development of the comprehensive plan required under the provisions of RCW 74.13. In the Department's view, the trial court's interference in an agency function constituted a violation of the separation of powers doctrine. See In re Salary of Juvenile Director, 87 Wash.2d 232, 245, 552 P.2d 163 (1976).
Courts will not interfere with the work and decisions of an agency of the state, so long as questions of law are not involved, and so long as the agency acts within the terms of the duties delegated to it by statute. See Morgan v. Department of Soc. Sec., 14 Wash.2d 156, 184, 127 P.2d 686 (1942); State ex rel. York v. Board of County Comm'rs, 28 Wash.2d 891, 901, 184 P.2d 577, 172 A.L.R. *1302 1001 (1947). However, where the acts of public officers are arbitrary, tyrannical, or predicated upon a fundamentally wrong basis, then the courts may interfere to protect the rights of individuals. See Group Health Coop. v. King County Med. Soc'y, 39 Wash.2d 586, 669, 237 P.2d 737 (1951). Here, the Department was not acting within the terms and duties delegated to it by RCW 74.13.031(1). The trial court's order, requiring DSHS to perform its duty according to professionally accepted procedures and standards, did not interfere with the Department's ability to use its discretion in creating a reasonable, adequate plan that would satisfy the requirements of RCW 74.13.031(1).

3. Foster Care Claims
The trial court ruled that the legislative scheme of the juvenile dependency and termination statute, RCW 13.34, contemplates immediate and intensive support services to a family whose child may be removed from parental custody, and that all reasonable efforts must be made to prevent the separation of children from their parents. The trial court then ruled that the determination of whether reasonable services have been provided is ultimately the responsibility of the judiciary. The trial court ruled that, in those cases where a family's homelessness is the primary factor that would either result in a child's placement in foster care or prevent reunification, and if it is in the child's best interests, the court has the authority to require the Department to provide some form of housing assistance.
The Department argues that the trial court had no jurisdiction to enter a declaratory judgment regarding RCW 13.34 because (1) RCW Title 13 gives exclusive jurisdiction to the juvenile court over proceedings relating to dependencies and terminations, (2) there was no justiciable controversy before the court, or (3) the doctrine of res judicata bars the court's consideration of plaintiffs' claims.
The basic juvenile court act, RCW 13.04, establishes the juvenile court as a division of the superior court, RCW 13.04.021, and creates a procedure for the disposition of many actions involving minors.
RCW 13.04.030(1)[5] provides, in pertinent part:
[T]he juvenile courts in the several counties of this state, shall have exclusive original jurisdiction over all proceedings:
....
(b) Relating to children alleged or found to be dependent as provided in chapter 26.44 RCW and in RCW 13.34.030 through 13.34.170;
(c) Relating to the termination of a parent and child relationship as provided in RCW 13.34.180 through 13.34.210[.]
(Emphasis added.)
This statute was construed by this court in State v. Werner, 129 Wash.2d 485, 918 P.2d 916 (1996), a case in which a juvenile charged with drug offenses challenged the superior court's jurisdiction to issue an arrest warrant for a juvenile. The trial court and Court of Appeals determined the warrant was invalid on the basis that it was issued by the superior court, a court lacking jurisdiction over juveniles. See Werner, 129 Wash.2d at 490, 918 P.2d 916. We reversed, holding that the lower courts' narrow interpretation of RCW 13.04.030 overlooked the state constitution, Wash. Const. art. IV, § 6 (amend. 87), a more fundamental authority than the statute. As we noted in Werner, superior courts are courts of general jurisdiction. They have original jurisdiction in all cases in which jurisdiction has not been vested exclusively in some other court. See Werner, 129 Wash.2d at 492, 918 P.2d 916. The juvenile court is only a division of the superior court, not a separate constitutional court. See Werner, 129 Wash.2d at 492, 918 P.2d 916.
One of plaintiffs' claims for relief in the present case was for a declaratory judgment that the Department's failure to provide housing assistance to homeless children involved in dependency actions violates the *1303 duty imposed on DSHS under the dependency statute, RCW 13.34, to make "reasonable efforts" to reunite children with their parents and to prevent or shorten foster care placements. This claim was brought pursuant to the Uniform Declaratory Judgments Act, RCW 7.24, which provides in part:
Courts of record within their respective jurisdictions shall have power to declare rights, status and other legal relations whether or not further relief is or could be claimed.
RCW 7.24.010.
The Uniform Declaratory Judgments Act is a remedial statute which is to be liberally construed and administered. See RCW 7.24.120. Its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations. See RCW 7.24.120.
Although RCW 13.04.030 states that the juvenile division of superior court has exclusive jurisdiction in juvenile matters, this court has not restricted the power to interpret the juvenile statutes to the juvenile courts. In Tommy P., 97 Wash.2d 385, 645 P.2d 697, we affirmed a declaratory judgment that the plaintiff class of juveniles who were or would be placed in juvenile detention pursuant to RCW 13.40 were entitled to an education while in detention. In Babcock v. State, 116 Wash.2d 596, 809 P.2d 143 (1991), we permitted a superior court hearing a tort action to interpret RCW 13.34, the dependency and termination statute.
We hold that a superior court has the power to interpret RCW 13.34 and to enter a declaratory judgment with respect to the rights of plaintiffs under the statute. Where, as here, the plaintiffs are a class of children who are or will be affected by the statute, the most efficient and consistent resolution of the question is through a declaratory action, rather than a case-by-case, appeal-by-appeal, basis in individual dependency proceedings.[6]
The Department next argues that the superior court lacked jurisdiction because there was no justiciable controversy before it.
In applying the Uniform Declaratory Judgments Act, we have consistently held that, absent issues of major public importance, a justiciable controversy must exist before a court's jurisdiction may be invoked under the Act. See Nollette v. Christianson, 115 Wash.2d 594, 598, 800 P.2d 359 (1990). Issues of major public importance have included questions of salary, tenure and eligibility to stand for office, being matters directly affecting the freedom of choice in the election process, see State ex rel. O'Connell v. Dubuque, 68 Wash.2d 553, 559, 413 P.2d 972 (1966), and whether a statute increasing the amount of excise tax was constitutional. See State ex rel. Distilled Spirits Inst., Inc. v. Kinnear, 80 Wash.2d 175, 178, 492 P.2d 1012 (1972).
For purposes of declaratory relief, a justiciable controversy is
"(1) ... an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."
Nollette, 115 Wash.2d at 599, 800 P.2d 359 (quoting Diversified Indus. Dev. Corp. v. Ripley, 82 Wash.2d 811, 815, 514 P.2d 137 (1973)). See also Acme Fin. Co. v. Huse, 192 Wash. 96, 73 P.2d 341, 114 A.L.R. 1345 (1937).
In the present case, (1) there are the mature seeds of a dispute as to the meaning of "reasonable efforts" in the context of homeless children who are affected by the state and federal laws governing foster care placements; (2) the dispute is between the Department and members of the class of homeless children and families who are being or will be affected by the Department's interpretation *1304 of the statute; (3) the interests of the class members are direct and substantial, as they affect the fundamental right of the family to remain together or to be reunited; and (4) finally, a judicial determination as to the authority and responsibility of the Department and of the juvenile court when involved with homeless children will be final and conclusive as to the issue raised in this case.
We conclude the issues involved here are issues of major public importance and that the trial court, therefore, had jurisdiction to make a ruling under the Uniform Declaratory Judgments Act. We also hold that a justiciable controversy exists in this case.
DSHS argues that because the claims raised could have been litigated in the juvenile court proceedings involving some of the named individual plaintiffs, the doctrine of res judicata should be found to bar the claims raised in this lawsuit. In order for res judicata to apply, there must be an identity of (1) subject matter, (2) cause of action, (3) persons and parties, and (4) quality of persons for or against whom the claim is made. See Rains v. State, 100 Wash.2d 660, 663, 674 P.2d 165 (1983).
Plaintiffs in the present case include individuals who have not participated in dependency actions, as well as some who have. The cause of action here is not limited to what efforts might be reasonable in a particular dependency case in order to prevent or shorten a foster placement. Instead, this is a declaratory action regarding the trial court's authority, under the statute, to order the Department to provide some form of housing assistance, in certain kinds of cases, in order to comply with the duty to make reasonable efforts to reunite the family. There is neither identity of parties nor identity of causes of action. Therefore, the doctrine of res judicata does not bar plaintiffs' action.
We now turn to the issue of whether a juvenile court has the authority to order DSHS to provide some form of housing assistance to families in cases where a child is placed in, or remains in, foster care in part because the family does not have adequate housing.
RCW 13.34 was enacted to conform with federal law governing what services are to be provided to children in foster care. Federal law requires that to obtain federal reimbursement, a state must have a plan which provides that in each case reasonable efforts will be made to prevent or eliminate the need for removal of the child from his or her parents and to make it possible for the child to be returned to his parents. See 42 U.S.C. § 671(a)(15). Washington implements this federal requirement through RCW 13.34.
The provisions of the dependency and termination act that are applicable to this issue are the following:
RCW 13.34.020, which provides:
The legislature declares that the family unit is a fundamental resource of American life which should be nurtured. Toward the continuance of this principle, the legislature declares that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail. The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.
RCW 13.34.060(8), governing emergency, temporary shelter care, which states:
The court shall release a child alleged to be dependent to the care, custody, and control of the child's parent, guardian, or legal custodian unless the court finds there is reasonable cause to believe that:
(a) After consideration of the specific services that have been provided, reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home; and
(b) ... (ii) The release of such child would present a serious threat of substantial harm to such child[.]
*1305 RCW 13.34.130(1)(a) and (b), governing disposition orders in dependency cases:
The court shall order one of the following dispositions of the case:
(a) Order a disposition other than removal of the child from his or her home, which shall provide a program designed to alleviate the immediate danger to the child, to mitigate or cure any damage the child has already suffered, and to aid the parents so that the child will not be endangered in the future. In selecting a program, the court should choose those services that least interfere with family autonomy, provided that the services are adequate to protect the child.

(b) ... An order for out-of-home placement may be made only if the court finds that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home, specifying the services that have been provided to the child and the child's parent, guardian, or legal custodian, and that preventive services have been offered or provided and have failed to prevent the need for out-of-home placement[.]
(Emphasis added.)
The dependency statute requires a specific service plan be developed for each child placed in foster care, RCW 13.34.130(3)(b)(i). It also requires the court conducting a placement review hearing to determine whether additional services are needed to facilitate the return home. If they are, then the court is to order that reasonable services be offered, "specifying such services," to children who are placed in foster care for six months or more. See RCW 13.34.130(5)(b)(vii).
In making any placement decision under RCW 13.34, the trial court is required to give primary consideration to the child's best interests. See In re Dependency of J.B.S., 123 Wash.2d 1, 10, 863 P.2d 1344 (1993).
The trial court in the present case ruled that, under RCW 13.34, the determination that reasonable efforts have been made and that reasonable services have been provided is ultimately the responsibility of the judiciary. It further ruled that that determination will vary with the circumstances of each individual case, but in those cases in which the court determines that a family's homelessness is the primary factor that would either result in a child's placement or prevent reunification and, if it is in the child's best interest, the court has the authority to require the Department to provide some form of housing assistance.
One of the fact settings before the court involved plaintiff Sanders and her three children. The children were determined to be dependent, pursuant to RCW 13.34, because of their mother's inability to protect them. They were at risk in part because of their mother's actions (she left the state with her children in an attempt to protect her husband, who was accused of molesting her daughter). A plan for reuniting the family was included in the disposition order. That order required the mother to (1) participate in a nonoffending spouses group; (2) comply with her probation; (3) obtain stable housing adequate to meet the children's needs;[7] (4) *1306 provide DSHS with a written plan for protecting the children; and (5) sign releases of information. Within a short time, the mother complied with all of the court-ordered conditions, except the one requiring that she obtain adequate housing. The court order entered in October 1990 in the dependency case expressly permitted return of the children once the mother had housing for them. She was unable to find adequate housing for more than one year. Although she acquired some training and a job, she earned only a small income and was required to pay the state $278 per month toward the cost of foster care for her children. The caseworker's declaration indicates that he was unable to provide housing assistance for Ms. Sanders because resources for such assistance are not made available by DSHS.
Under the trial court's order in the present case, the juvenile court judge hearing the dependency action could have ordered DSHS to provide housing assistance of some sort to Ms. Sanders in order to facilitate the reunification of the family.
The Department argues the trial court erred in its interpretation of the statute because there is no specific grant of authority in RCW 13.34 to the court to order DSHS to provide housing assistance. In the Department's view, if the court does not believe that reasonable efforts have been made to prevent or to remedy the need for foster care for the child, the court may order that the child remain with or be returned to the parents but may not order that specific services be provided to alleviate the need for foster care.
The Department's argument that a juvenile court has no alternative but to deny foster placement and to return the child to an unhealthy or dangerous situation when it finds reasonable efforts have not been made to prevent or eliminate the need for foster care is contrary to both the best interest standard and the dependency statute.
In In re J.H., which is cited by DSHS in support of its position, the Court of Appeals held that a juvenile court hearing a dependency action abused its discretion in ordering the Department to provide up to $1,200 in cash to secure private housing for a mother and her children in order to prevent foster care. See In re J.H., 75 Wash.App. at 894-95, 880 P.2d 1030. The Court of Appeals determined that such an order presumed the availability of $1,200 that the Legislature had not specifically appropriated for that purpose and constituted an unlawful incursion into the legislative realm. See In re J.H., 75 Wash.App. at 894, 880 P.2d 1030. The Department argues the same reasoning applies here because there is no specific appropriation for general housing assistance in dependency cases. DSHS presents no evidence of specific appropriations for other kinds of services, such as counseling, or drug and alcohol treatment, which are routinely provided to families of dependent children under the "reasonable efforts" clause. The Court of Appeals reversed the order in In re J.H. because it viewed that order as an appropriation of funds and thus an incursion into what is purely a legislative function. In re J.H. does not hold that a juvenile court lacks authority to determine that "reasonable efforts" may include housing assistance of some kind.
Under RCW 13.34, the juvenile court is given the responsibility for determining whether DSHS has made reasonable efforts to prevent or to end foster placements of dependent children. The court is required to approve the Department's service plans, purporting to be based on reasonable efforts, and to incorporate those plans in court orders. As in all matters dealing with the welfare of children, the court must additionally act in the best interests of the child. The court is able to perform its duties under the statute only if the statute is interpreted to authorize the court to order DSHS to make reasonable efforts to provide services in the area of need that is the primary reason for the foster placement. See, e.g., State v. Hayden, 72 Wash.App. 27, 30-31, 863 P.2d 129 (1993) (holding that the general structure and purpose of the Juvenile Justice Act of 1977 granted implied authority to the juvenile court to modify the terms of a juvenile offender's disposition).
*1307 We hold that a juvenile court hearing a dependency proceeding has authority to order DSHS to provide the family with some form of assistance in securing adequate housing in those cases where homelessness or lack of safe and adequate housing is the primary reason for the foster placement or the primary reason for its continuation.
In its cross-appeal the Coalition argues that the trial court erred in limiting the authority of the court in two ways.
First, it argues the trial court's authority to order the Department to provide housing assistance should not be limited to dependency cases but should apply to all cases of foster carewhether voluntary or involuntary. The Coalition cites only general principles in support of its position. The only basis for judicial intervention in a foster placement is found in RCW 13.34. Based on the arguments before the court, we are unable to hold that the court has general authority to oversee voluntary foster care placements.
Second, the Coalition argues that the court's authority to order housing assistance should not be limited to those cases in which the lack of adequate housing is "the primary factor" in the foster placement. Instead, the Coalition argues that the juvenile court should decide what reasonable assistance will be necessary and effective to prevent or shorten placement.
The difficulty with the Coalition's position is that it would require the court to independently develop a service plan in each case. This is the responsibility of the Department, not the court. See RCW 13.34.130-.145. In certain, limited cases, the primary reason a child is initially placed in foster care or remains in foster care is that the child's family lacks adequate housing. In those cases, where the other problems posing a risk to the child have been decreased or eliminated, the juvenile court is able to determine that a specific class of service should be offered in order to comply with the reasonable efforts provision. Where, however, the family's problems are numerous and interrelated, the need for a particular service at a particular time is not so obvious and is better left to the caseworker.
We hold that RCW 13.34, the juvenile dependency statute, permits a juvenile court to order the Department to provide housing assistance in some form to children and their families in those cases where lack of adequate housing is the primary factor in the out-of-home placement. Although the nature of the services would be within the discretion of the Department, the adequacy of the service, or the reasonableness of the effort, is a determination to be made by the court.

4. Adoption Assistance and Child Welfare Act of 1980
Pursuant to 42 U.S.C. § 1983, the plaintiffs alleged a violation of the Adoption Assistance and Child Welfare Act of 1980 (AACWA) based on the Department's alleged failure to provide housing assistance where necessary to prevent or shorten the need for foster care placement of homeless children.
AACWA, which is part of the Social Security Act, establishes a federal reimbursement program for certain expenses incurred by the states in administering foster care and adoption services. To participate in the program, a state must develop a plan for the delivery of child welfare services and that plan must be approved by the federal Secretary of Health and Human Services. See Suter v. Artist M., 503 U.S. 347, 350-51, 112 S.Ct. 1360, 1363-64, 118 L.Ed.2d 1 (1992).
The provisions of the Act which are pertinent here are the following:
42 U.S.C. § 671, which states in part:
(a) Requisite features of State plan
In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which
....
(15) effective October 1, 1983, provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home;

*1308 (16) provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child[.]
42 U.S.C. § 675(1), providing:
The term "case plan" means a written document which includes at least the following:
....
(B) A plan for assuring that the child receives proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan.
42 U.S.C. § 675(5), providing:
The term "case review system" means a procedure for assuring that
....
(B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review (as defined in paragraph (6)) in order to determine the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care, and to project a likely date by which the child may be returned to the home or placed for adoption or legal guardianship[.]
The Federal Civil Rights Act, 42 U.S.C. § 1983, provides for a private cause of action for the violation of federal statutory rights as well as for violation of constitutional guaranties. See Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). The remedy provided under § 1983 is for violation of federally conferred rights, not simply a violation of federal law. See Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990).
Section 1983 is to be broadly construed to provide coverage unless (1) the federal statute involved does not create enforceable rights, privileges or immunities, or (2) Congress has expressly foreclosed private enforcement within the terms of the statute itself. See Wilder, 496 U.S. at 508, 110 S.Ct. at 2516-17.
The year after the present lawsuit was filed, the United States Supreme Court, in March 1992, held that 42 U.S.C. § 671(a)(15), the "reasonable efforts" section of AACWA, does not create a private and enforceable right on behalf of children involved in a state's child welfare system. See Suter, 503 U.S. at 350, 112 S.Ct. at 1363.
After the Suter decision was filed, the trial court in the present case dismissed all of the plaintiffs' claims based on the federal law.
In 1994 Congress amended the Social Security Act to include the following section:
In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M. [503 U.S. 347], 112 S.Ct. 1360 [118 L.Ed.2d 1] (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671(a)(15) of this title is not enforceable in a private right of action.
42 U.S.C. § 1320a-2. This amendment applies to actions pending on the date of its enactment, October 20, 1994, and to actions brought on or after that date.
*1309 The parties agree that, under the 1994 amendment, 42 U.S.C. § 671(a)(15), relating to "reasonable efforts," is not enforceable by the plaintiffs. However, plaintiffs claim that Suter did not affect the enforceability of the "case plan" provisions of AACWA. Plaintiffs seek a ruling that the "case plan" sections of the Act create a federal statutory right that is enforceable in a private action.
The test for determining whether an enforceable right exists is set forth in Wilder, 496 U.S. 498, 110 S.Ct. 2510; Suter, 503 U.S. 347, 112 S.Ct. 1360; Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); Wright v. Roanoke Redev. & Hous. Auth., 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); and Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989). That test requires consideration of the following three questions:
(1) Was the provision in question intended to benefit the plaintiffs?
(2) Does the statutory provision in question create binding obligations on the state, rather than merely expressing a congressional preference?
(3) Is the interest plaintiffs assert specific enough to be enforced judicially, rather than being vague and amorphous?
See Wilder, 496 U.S. at 509, 110 S.Ct. at 2517.
The Department argues that plaintiffs cannot show that the interests they assert are specific enough to be enforced judicially. We agree. While the provisions of any individual case plan may be specific enough to be enforced judicially, the notion that case plansin generalare to be implemented is too vague and amorphous to be enforced. Any enforcement would have to await a particular case plan.
In the context of the relief requested by plaintiffs, the statutory language here is too amorphous and vague to be enforced.

5. Constitutional Right to Housing Assistance
The trial court ruled that neither the federal nor the state constitution confers a due process right, express or implied, to affirmative assistance from the State for housing and dismissed the Homeless Coalition's constitutional claims. See Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (due process and equal protection clauses of federal constitution do not require the government to provide housing assistance as affirmative relief); In re J.H., 75 Wash.App. at 892, 880 P.2d 1030 (rejecting a mother's argument that the State has an enforceable constitutional obligation to provide her with funds for housing, stating that although a parent has a fundamental liberty and privacy interest in the care and custody of a child, "the constitution does not guarantee family unity at state expense").
The Coalition is not asking for affirmative relief in the form of specific housing assistance. Instead, it requests a general ruling from this court that substantive due process is violated if the State intrudes into a family and removes a child from the parent's care without placing the child in the least restrictive setting.
The liberty and privacy protections of the due process clause of the Fourteenth Amendment establish a parent's constitutional right to the care, custody and companionship of his or her child. See In re Welfare of Sumey, 94 Wash.2d 757, 762, 621 P.2d 108 (1980) (citing Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 29 A.L.R. 1446 (1923); In re Welfare of Myricks, 85 Wash.2d 252, 253-54, 533 P.2d 841 (1975). This right has been described as a "sacred right," In re Sumey, 94 Wash.2d at 762, 621 P.2d 108, which is "`so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" Myricks, 85 Wash.2d at 254, 533 P.2d 841 (quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674, 90 A.L.R. 575 (1934)). It is considered to be "`more precious to many people than the right of life itself.'" In re Welfare of Luscier, 84 Wash.2d 135, 137, 524 P.2d 906 (1974) (quoting In re Welfare of Gibson, 4 Wash.App. 372, 379, 483 P.2d 131 (1971)).
*1310 This fundamental right on the part of parents is not absolute. See Sumey, 94 Wash.2d at 762, 621 P.2d 108. See also Taggart v. State, 118 Wash.2d 195, 235, 822 P.2d 243 (1992) (Guy, J., dissenting) (the goal of reuniting children with their parents should not rest on an assumption that children are property). However, the right to the care, custody and companionship of one's child cannot be abridged without due process of law. See In re Welfare of Key, 119 Wash.2d 600, 609, 836 P.2d 200 (1992). In assessing the constitutionality of any procedure which infringes upon a parent's right to the care and custody of his or her child, it is necessary to ascertain the proper balance between the parent's constitutional rights and the State's constitutionally protected parens patriae interest in protecting the best interests of the child. See In re Sumey, 94 Wash.2d at 762-63, 621 P.2d 108. In order to withstand constitutional scrutiny, any action infringing on a fundamental right must be narrowly tailored to serve a compelling state interest. See Reno v. Flores, 507 U.S. 292, 301-02, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1 (1993).
The Coalition asserts that removal of a child from the care of his or her parents and placement of the child in a foster home cannot withstand constitutional scrutiny, under the "narrowly tailored" test, in those cases where a less restrictive alternative is available. The Coalition proposes that housing assistance is a less restrictive alternative to foster care.
Although we have not considered this issue in the context of foster care, we have looked at the issue with respect to "placements" of disabled individuals in mental health facilities. See In re Detention of J.S., 124 Wash.2d 689, 880 P.2d 976 (1994).
In In re J.S., we held that placement in the least restrictive setting is not constitutionally mandated under the civil commitment law. We determined, however, that where a trial court has the power to determine the best interests of an involuntarily committed individual in ordering treatment pursuant to a civil commitment statute, the trial court has the authority to consider a less restrictive alternative than that proposed by the State. See In re J.S., 124 Wash.2d at 699, 880 P.2d 976. Although a trial court may order less restrictive treatment under the civil commitment statute, the constitution does not require it. See In re J.S., 124 Wash.2d at 699, 880 P.2d 976. See also Youngberg v. Romeo, 457. U.S. 307, 323, 102 S.Ct. 2452, 2462, 73 L.Ed.2d 28 (1982) (involuntary commitment of mentally retarded person violated due process only if it was not based on professional judgment).
We apply a similar analysis in the dependency setting without reaching the constitutional question. The dependency statute, pursuant to which most involuntary foster placements would be made, requires the court to act in the best interests of the child, In re J.B.S., 123 Wash.2d at 8-9, 863 P.2d 1344, and to develop programs for children that will "least interfere with family autonomy, provided that the services are adequate to protect the child." RCW 13.34.130(1)(a); see In re J.B.S., 123 Wash.2d at 12, 863 P.2d 1344; In re J.H., 75 Wash.App. at 894, 880 P.2d 1030. Ultimately what is in the best interests of a particular child depends on "a highly fact-specific inquiry that cannot be reduced to a mathematical equation." In re J.B.S., 123 Wash.2d at 11, 863 P.2d 1344.
Because our state statute requires the court to find reasonable efforts have been made to reunite the child with his or her family or to prevent removal of the child from the family before an out-of-home placement may be made, and because the statute requires the court to develop a program for the child that will least interfere with family autonomy, a court involved in the placement of a child in foster care has the authority to require a less restrictive but reasonable placement when it is in the best interest of the child. We thus deem it unnecessary to answer the constitutional question posed. See Tommy P., 97 Wash.2d at 391, 645 P.2d 697 (this court will not decide an issue on constitutional grounds when that issue can be resolved on other grounds).

CONCLUSION
We hold that RCW 74.13.031(1) requires the Department of Social and Health Services *1311 to provide child welfare services and to develop, administer, supervise, and monitor a coordinated and comprehensive plan that establishes, aids, and strengthens services for the protection and care of homeless children. The Department has not complied with this statutory mandate. In developing the comprehensive plan required by the statute, the Department must perform its duty according to professionally recognized standards and procedures. We also hold that the general structure and purpose of the dependency statute, RCW 13.34, gives implied authority to the juvenile court to order that housing assistance be provided to children and their families in those cases where homelessness or lack of adequate housing is the primary factor in placing or maintaining a child in foster care.
We determine that plaintiffs have no cause of action based on federal law and we decline to decide the constitutional claims.
Affirmed.
DOLLIVER, SMITH, JOHNSON and ALEXANDER, JJ., concur.
SANDERS, Justice. (dissenting in part, concurring in part).
I dissent from the majority opinion insofar as it affirms a trial court order which, in effect, orders a massive diversion of tax dollars to provide housing for low income families. The majority finds a private right to compel this result in RCW 74.13.031(1) and provisions of the juvenile court act, RCW 13.34.

I. RCW 74.13.031(1)
This statute provides:
The department [of social and health services] shall have the duty to provide child welfare services as defined in RCW 74.13.020, and shall:
(1) Develop, administer, supervise, and monitor a coordinated and comprehensive plan that establishes, aids, and strengthens services for the protection and care of homeless, runaway, dependent, or neglected children.
RCW 74.13.031(1). The threshold question is whether DSHS complied with this statute. If it did, we need not consider whether these plaintiffs have standing to prosecute the action since, even if they lacked standing, the result would be no different: reversal of the trial court and dismissal of their claim.
Let us begin by accepting all the usual rules of statutory construction as set forth by the majority, Majority at 1297 and 1298, and attempt to give the statutory text its ordinary meaning within its grammatical context. I initially posit, as patently obvious, the section at issue directs the Department of Social and Health Services (not the recipient or the court) to make a plan of a particular kind and then carry it out. The trial court conceded the department had indeed fulfilled its statutory responsibility, at least to the extent that it had actually drafted a plan in the form of Defendant Exhibit 1 (State of Washington Child Welfare Plan FY 1994-1997 (Sept. 1993)) and Defendant Exhibit 5 (Comprehensive Plan to Coordinate Services for Homeless Children and Families (July 1993)). Br. of Resp'ts and Cross-Appellants (App. 1, Transcript of the Ruling of the Honorable Judge Ann Schindler at 5 (Oral Opinion) (July 28, 1994)). The issue thus boils down to whether or not this "plan" comprised of these two documents violates the statutory mandate that it be coordinated, comprehensive, and that it establish, aid, and strengthen services "for the protection and care of homeless, runaway, dependent, or neglected children." The trial court obviously concluded that the plan was insufficient in some undefined respect as it entered the following order which is the subject of this appeal:
IT IS HEREBY ORDERED that DSHS shall submit to the court and to the plaintiffs a coordinated and comprehensive plan that establishes, aids and strengthens services for homeless families and their children within 5 months of the entry of this order;
IT IS FURTHER ORDERED that the court will hold further hearings or require the submission of additional material as it finds to be necessary for its determination and monitoring of the plan's adequacy....
*1312 Clerk's Papers (CP) at 1627 (Findings of Fact, Conclusions of Law and Order at 7 (Mar. 6, 1995)) (emphasis added). The trial court order does not tell us exactly what is wrong with the current plan or exactly what should replace it. It seems to speak in code.
Appellant DSHS claims the trial court erred with respect to the subtle yet all important change from its admitted statutory duty to plan for services for "homeless ... children" to a wholly new and different undertaking to plan for the provision of services to homeless "families." Br. of Appellants at 1 (Assignment of Error A-1) ("The trial court erred in ruling that the term homeless children means children of homeless families....").
It is a fair reading of the record to conclude that the entire proceeding in the court below was premised on the proposition that the statute at issue requires DSHS to exceed its rather clear statutory responsibility to plan for services to mitigate the needs of homeless children by, in addition, also undertaking the completely separate and more onerous obligation of planning to meet the housing needs of the families from which these children emanate.
Although the trial court findings, conclusion, order, and oral opinion are not a picture of clarity in this regard, I note the trial court finds fault only with the subject plan in terms of its alleged failure to adequately provide or plan for the "care of homeless children," Oral Opinion at 5, as well as the trial court's apparent intent to equate the "homeless children" with houseless families. Such is quite manifest in its February 16, 1994 Order on Cross Motions for Summary Judgment (e.g., "[h]omeless children include children who are members of homeless families," CP at 981) as well as the operative order itself which similarly uses the term "homeless families." Findings of Fact, Conclusions of Law and Order at 7 (Mar. 6, 1995).
By ordering DSHS to return with a new plan to increase services to "homeless families," it therefore appears the trial court expects DSHS to not only ... reach behind the "homeless children" to find their antecedent families but also to render services which cost money to those families, e.g., write them a check, pay their rent, or what have you. In other words, it would appear to be inadequate in the eyes of the trial court to simply announce in the "plan" that the taxpayers of this State have simply not seen fit to allocate public funds directly or indirectly to the families of "homeless children" as that is the position, more or less, with which the plaintiffs found fault in the first instance.
If the plaintiffs here have standing to pursue such an end it is because they would benefit from it. However I find no benefit inuring to the plaintiffs from a result which would be unacceptable to them yet achieved through procedures internal to DSHS other than those currently employed. Thus plaintiffs' standing is limited, if they have it at all, to complaints they might posit about the final result of the plan rather than how the department internally developed the plan. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992) (to have standing, a plaintiff must suffer an "injury in fact," that is an invasion of a legally protected, concrete and particularized interest).
Turning then to the residual issue, does the failure of DSHS to plan and/or provide services to "homeless families" violate the statute, I would answer no.
As a matter of fact, the clear language of the statute contemplates services be planned (provided?) for children who are, in fact, homeless. Although it strikes me that a "homeless" child may or may not be a "houseless" child, the distinction is not particularly pertinent for the purpose of the statute since it clearly provides that services be planned for a child once he or she is homeless. ("[S]ervices for the protection and care of homeless, runaway, dependent, or neglected children." RCW 74.13.031(1).) I posit it is entirely reasonable for the State to construe this statutory duty to require it to plan, and in some cases provide, to meet the needs of those children whose needs are not met by their responsible parents, for whatever reason. However, that is precisely what the State has done in its comprehensive plan to coordinate services for homeless children and families. Defendant Exhibit 5. As a matter of fact even a cursory reading of the *1313 document demonstrates that the department has far exceeded its minimum statutory obligation as the document plainly provides services to the antecedent family unit to "prevent the out-of-home placement of children." Defendant Exhibit 5, at 1. The document expressly provides
[C]hildren will not be removed from the custody of a parent, or prevented from returning to the custody of a parent, solely on the basis of the family's homelessness, residence in a shelter or in substandard housing. Child placement should not occur unless there is reason to believe the child is at risk of harm due to abuse, neglect, abandonment or the parent's inability to provide adequate care and DSHS has made reasonable efforts to alleviate the conditions that make out-of-home placement necessary.
Id. In excess of its statutory responsibility the plan summarizes income assistance that is available to families in the form of AFDC, general assistance, food stamps, consolidated emergency assistance program, and additional requirements. Id. at 2-3.
The plan provides for services to children, including case management services, services which prevent or shorten foster care placement, home based services, family reconciliation services, homebuilders family preservation services, home support specialists, domestic violence programs, independent living services, street youth programs, foster care placement services, and homeless child care. The plan goes on to detail other services which indirectly impact homelessness, including child care services, adoption support services, Indian child welfare services, juvenile rehabilitation services, refugee assistance, mental health services, alcohol and substance abuse services, vocational rehabilitation services, and medical assistance.
The plan has a section on "proposed enhancements" relating to service enhancements for AFDC families with children at risk of abuse and neglect which include short-term placements, community resource coordination, liaison with public housing authorities, parental notification, coordination between DSHS social service divisions, and training. How the majority of this court can claim that Defendant Exhibit 5 (let alone Defendant Exhibit 1) does not fulfill the statutory requirement which, after all, directs the department, not the court, to devise the plan escapes me. What is statutorily wrong with this plan? What is the State supposed to do to correct the deficiency? The majority won't tell.
Rather in the final analysis, the majority is judicially imposing a legal obligation upon the taxpayers of the State of Washington to undertake a massive new welfare program to provide housing for low-income families. However such is not a judicial function. It is a legislative one. The trial court, and the majority of this court, are not only legislating from the bench but also requiring massive new appropriations not authorized by the Legislature. This we cannot do. Hillis v. Department of Ecology, 131 Wash.2d 373, 389-90, 932 P.2d 139, 147-48 (1997) ("While it may be very tempting for this Court to order the Legislature to appropriate ... funds ..., such action would violate the separation of powers doctrine.... Just because we do not think the legislators have acted wisely or responsibly does not give us the right to assume their duties or to substitute our judgment for theirs.")
Moreover, as the department correctly notes, the Legislature, in passing the Affordable Housing Program, Title 43, Chapter 185A, and the Washington Housing Policy Act, Title 43, Chapter 185B, specifically addressed homelessness and the lack of sufficient low-income housing in this State. In so doing it provided that the funding and responsibility for these efforts would be directed to the Department of Community, Trade, and Economic Development, not the Department of Social and Health Services. See RCW 43.185A.030(1) ("Using moneys specifically appropriated for such purpose, the department [of community, trade and economic development] shall finance in whole or in part projects that will provide housing for low-income households.").
The Legislature alone decides to what extent child welfare services will be funded. The decisions of the trial court and the majority contravene the policy and appropriation *1314 decisions of the elected representatives of the people. Absent evidence that such decisions conflict with the dictates of the state or federal constitutions, this court has no authority to second-guess the Legislature's appropriation decisions. In so doing, we tread into areas where our competence and capabilities are at a minimum. See Missouri v. Jenkins, 515 U.S. 70, 132, 115 S.Ct. 2038, 2070, 132 L.Ed.2d 63 (1995) (Thomas, J., concurring) ("When we presume to have the institutional ability to set effective ... budgetary, or administrative policy, we transform the least dangerous branch into the most dangerous one.").

II. RCW 13.34Juvenile Court Act
Like the trial court, the majority also tries its hand at redrafting the juvenile court act, RCW chapter 13.34.
RCW chapter 13.34 governs dependencies, guardianships, and termination of parental rights proceedings. It sets forth the procedures concerning "Dependency of a Child and the Termination of a Parent and Child Relationship." RCW 13.34.010. The statute addresses emergency and temporary shelter care, directing the juvenile court that "[a]fter consideration of the specific services that have been provided, reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home...." RCW 13.34.060(8)(a). From this language, the majority concludes the juvenile court has the authority to order the department to provide a houseless family some form of assistance to secure adequate housing in those cases where houselessness is the primary reason for the placement or continuation of a child in foster care.
In re Welfare of J.H., 75 Wash.App. 887, 889, 880 P.2d 1030 (1994), review denied, 126 Wash.2d 1024, 896 P.2d 63 (1995), addressed "the power of a juvenile court to order the Department of Social and Health Services to provide unbudgeted funds to house a homeless mother and her four dependent children who may otherwise be subject to placement in foster care." The appellate court held the juvenile court did not posses such authority because "`[t]he decision to create a program as well as whether and to what extent to fund it is strictly a legislative prerogative.'" Id. at 894, 880 P.2d 1030 (quoting Pannell v. Thompson, 91 Wash.2d 591, 599, 589 P.2d 1235 (1979)). Consequently, the court concluded,
[t]he mother's argument that expenditures for housing assistance are more cost effective in the long run than placing children in foster care is for the Legislature to consider. The [trial] court's order requiring the Department to provide $1,200 in cash to secure private housing for this family in order to avert the possibility of foster home placement not only presumes the availability of $1,200 that the Legislature has not appropriated, but also presumes the court's ability to administer an open-ended housing assistance program for similarly situated families.
In re J.H., 75 Wash.App. at 894, 880 P.2d 1030 (footnotes omitted).
The resolution of the case at hand hinges in part on whether J.H. is still good law. The Court of Appeals' decision is concise and unequivocal: the juvenile court does not have the authority to order the department to provide housing assistance to homeless families. Yet somehow the majority concludes the trial court does have this authority yet it does not disprove J.H. It instead concludes that J.H. "does not hold that a juvenile court lacks authority to determine that `reasonable efforts' may include housing assistance of some kind." Majority at 1306. But that is exactly what J.H. says. J.H. says the decision to create and fund a program is strictly a legislative prerogative, and because the Legislature did not provide funding for housing assistance to the department, the juvenile court lacked the authority to order such assistance. To say the Court of Appeals held otherwise is disingenuous.
The "reasonable efforts" language in RCW 13.34.060(8)(a) applies to cases where the department seeks to place the child in foster care. If the juvenile court finds the department has not made "reasonable efforts," it can deny the department's request to place the child in foster care. The juvenile court's limited power to order services does not mean it is obliged to ignore the connection *1315 between foster placement and a family's homelessness. As the Court of Appeals in J.H. noted, the juvenile court has the authority to confront this dilemma
not with the tools of appropriation and administration ... but by means of its authority as a court. The court has indisputable authority over the parties, as well as statutory authority to require that an individualized service plan proposed for a dependent child do a better job of meeting critical needs. The court has the power to compel the attendance in the courtroom of the caseworker, or his or her supervisor, or even the Secretary of the Department, as frequently as necessary until the agency acts with the urgency and effectiveness that the particular needs of the children demand.
In re J.H., 75 Wash.App. at 895, 880 P.2d 1030.
Moreover, the decision in J.H. is reinforced by our recent decision in Hillis. As noted above, Hillis explicitly reaffirmed that a court cannot force an arm of the executive to perform a duty for which the Legislature has not provided funding. J.H. also operated upon this premise. The majority ignores Hillis and rewrites the holding in J.H.
The majority's decision amounts in the end to little more than judicial taxation. It identifies a social problem, delineates the steps it feels are necessary to address the problem, and orders the executive to expend public moneys to enforce its decision. However, this is the role of the Legislature, not the courts. "Under our Constitution, judges do not have the power to tax. When they are seen to be taxing, citizens come to feel ... that they have lost control of their government." Hearings on S. 1817, Fairness in Judicial Taxation Act of 1996, Before the Subcomm. on Admin. Oversight and the Courts of the Comm. on the Judiciary, 104th Cong., 2d Sess. (1996) (statement of Roger Pilon, Ph.D., Senior Fellow and Director, Cato Institute).

Conclusion
"[A] house is not a home." Keel v. Keel, 225 Va. 606, 303 S.E.2d 917, 922 (1983). The majority opinion represents an attempt by the judiciary to solve a massive societal problem of houselessness. It attempts to do this by ordering the executive branch to provide cash assistance to houseless families to enable them to obtain "affordable housing."[1] In so doing, it ignores the actual dictates of the Legislature and rewrites the holding of *1316 an on-point decision of the Court of Appeals. The court is not the place to write public policy.
Our Constitution leaves such responsibilities to the Legislature. Because the Legislature did not authorize the department to undertake the tasks the majority has assigned, I would reverse the decision of the trial court and remand for entry of judgment consistent with this opinion.
DURHAM, Chief Justice (dissenting).
The majority holds (1) that the Department of Social and Health Services (Department) has an enforceable duty under RCW 74.13.031(1) to develop and implement a plan providing for, among other things, "adequate" homeless children's services; and (2) that juvenile courts have authority under RCW 13.34 to order the Department to provide housing assistance in dependency cases where homelessness or lack of adequate housing is a primary factor in the decision to place a child in foster care. I disagree with the majority on both of these issues.
Regarding the first issue, RCW 74.13.031(1) is a general policy statement that does not give rise to enforceable rights. Consequently, the question of the adequacy of the Department's plan for homeless children is nonjusticiable and would have the courts intruding into the discretionary authority of our coordinate branches of government. Moreover, even if the Department had a duty to provide a certain level of homeless children's services, relief would not be warranted under the Administrative Procedure Act (APA)[1] standard of review. Thus, the Plaintiffs' claim regarding the adequacy of the Department's plan for homeless children should be dismissed.
Regarding the second issue, juvenile courts lack statutory authority to order the Department to provide housing assistance in dependency actions. Additionally, declaratory relief regarding juvenile courts' authority under RCW 13.34 is inappropriate for lack of a justiciable controversy. Thus, the Plaintiffs' claim regarding the juvenile court's authority to order the Department to provide housing assistance should also be dismissed.
I. The Department's Duty to Plan for Homeless Children's Services
A. Nonjusticiable Question
RCW 74.13.031(1) establishes the Department's general duty to plan for the needs of the State's at-risk children:
The department shall have the duty to provide child welfare services as defined in RCW 74.13.020, and shall:
(1) Develop, administer, supervise, and monitor a coordinated and comprehensive plan that establishes, aids, and strengthens services for the protection and care of homeless, runaway, dependent, or neglected children.
This statute does not, however, identify entitlements to specific services. Rather, it is the type of general policy statement that does not give rise to enforceable rights.[2]
The majority's determination that this statute mandates a specific plan for homeless children and services to implement such a plan reads far more into the statute than did the Legislature. A more realistic interpretation of RCW 74.13.031 is that the Legislature wanted the Department to address the problems of homeless, runaway, dependent, and neglected children in the Department's overall child welfare plan, and it did.[3] It is unlikely that the Legislature envisioned separate *1317 plans for each category of child (an expensive and time-consuming problem), or that the services discussed in such a plan would be an entitlement.
The ultimate import of the majority's decision is that a court will decide whether an executive branch plan for addressing the problems of homeless children is adequate. The trial judge, in determining the adequacy of the plan, will be required to micromanage services provided by the Department (and presumably the Department of Community, Trade, and Economic Development, which also provides services for homeless people), deciding whether or not a particular draft of a particular Department plan meets the statutory requirements.[4]
Also, in evaluating the adequacy of the plan, the court must determine whether the Department has provided adequate services. This determination necessarily touches upon the question of whether the Legislature has provided sufficient funding for the implementation of the services called for in the plan. The court considering all of these issues must intrude upon a variety of executive branch planning responsibilities and, ultimately, legislative funding priorities. Thus, the majority decision calls upon the judiciary to encroach directly upon, if not usurp, the decisionmaking processes of two coordinate branches of government.
In the past, this court has been sensitive to the prerogatives and responsibilities of the coordinate branches of our state government. In Seattle Sch. Dist. No. 1 v. State, 90 Wash.2d 476, 585 P.2d 71 (1978), this court ruled that the State failed to meet its paramount constitutional duty to fund basic education for the children of our state. Nevertheless, the court did not choose to prescribe in detail what constituted basic education under the state constitution; it left the remedy to the Legislature itself. Recently, in Hillis v. Department of Ecology, 131 Wash.2d 373, 932 P.2d 139 (1997), we were very conscious of separation of powers concerns in determining that this court should not intrude upon the legislative budgetmaking prerogative. Similarly, in In re the Welfare of J.H., 75 Wash.App. 887, 880 P.2d 1030 (1994), review denied, 126 Wash.2d 1024, 896 P.2d 63 (1995), the Court of Appeals determined that a juvenile court could not order the Department to provide unbudgeted funds to house a homeless mother and her children where the children might be subject to placement in foster care because of the lack of appropriate housing. In these decisions, courts evidenced considerable restraint in determining not to intrude upon a matter entrusted to the legislative or executive branches of government.
Regardless of how firmly any of us may personally support the appropriation of government funds for housing assistance for homeless families, such policy determinations are not the prerogative of the judicial branch of government. The judicial branch is by design, in many respects, the branch most distant from the political fray and least capable of resolving complex social problems with significant political and budgetary overtones. We cannot hold public hearings to investigate issues and hear from the myriad of competing interests. We are ill-equipped to balance the competing visions of such interest groups.[5] As a result, we should be most reluctant to involve ourselves in such political issues. We should leave their resolution to the political branches whose processes are more amenable to political give and take and the development of social policy. Conscientious observance of the separation of powers doctrine, "`the dominant principle of the *1318 American political system[,]'" requires no less.[6]
The present case does not present a justiciable controversy. In the absence of a constitutional violation or a failure to meet an express statutory mandate, the courts should leave the resolution of the state's homeless children's services to the partisan branches of government. We are asked here to intrude too directly into the policymaking function of the legislative branch to establish and fund social services, and into the prerogatives of the executive branch to plan and implement those social services. We should hold the present controversy regarding the Department's duty to plan for homeless children's services pursuant to RCW 74.13.031(1) is not justiciable. The Plaintiffs' claim should, therefore, be dismissed.
B. No Relief is Warranted Under the APA
Even were RCW 74.13.031(1) to entitle homeless children to a certain level of services, no relief would be warranted when the correct APA standard of review is applied. We recently reiterated in Hillis v. Department of Ecology, 131 Wash.2d 373, 932 P.2d 139 (1997) that, with limited exceptions not applicable here, the APA provides the exclusive means of judicial review of alleged agency inaction.[7] Pursuant to RCW 34.05.570(4) relief may be granted for a person aggrieved by an agency's failure to perform a legal duty only if the court determines that the inaction is either (1) unconstitutional; (2) outside of the agency's authority; (3) arbitrary or capricious; or (4) undertaken by unauthorized persons.[8] Thus, notwithstanding the majority's assertion otherwise, the courts may not review de novo whether an agency has fulfilled a legal duty. The role of the courts under the APA is very limited and deferential. Regardless of how inadequate the majority deems the Department's plan for homeless children, the Legislature did not include "inadequacy" as a criterion for granting relief from agency inaction. Therefore, unless and until the majority is able to conclude that the Department's efforts in planning and implementing services for homeless children are unconstitutional, unauthorized, or arbitrary or capricious, no relief may be granted and the Plaintiffs' claim should be dismissed.
II. Juvenile Courts' Authority to Order Housing Assistance
A. RCW 13.34.060 Does Not Authorize Courts to Order the Department to Provide Housing Assistance
The majority holds that a court in a dependency proceeding may order the Department to provide "some form" of housing assistance in cases where homelessness or lack of adequate housing is the primary reason for foster care placement.[9] In doing so, the majority rewrites RCW 13.34.060 to include a right to housing assistance, ignoring the well-established principle that we give effect to the unambiguous language of a statute.[10] Moreover, the majority would, once again, have the judiciary usurp the decisionmaking authority of our coordinate branches of government.
RCW 13.34.060 sets forth the court procedures and rights of parties in dependency proceedings. RCW 13.34.060(8) provides that a court shall release a child to his or her parent or legal guardian unless the court finds that reasonable efforts have been made to eliminate the need for removal from the child's home and, among other things, the release of the child would present a serious threat of substantial harm to the child.[11] *1319 This is strict limitation on the court's authority to disrupt families and reflects the high value placed on intact families and parents' right to exercise control over their children.[12] The only right under this statute is a parent's right to maintain custody of his or her child except when the State, despite reasonable efforts, is unable to ameliorate serious danger to the child. While some may favor an additional right to have the danger itself ameliorated, this is a decision for the Legislature to make. When a court in a dependency proceeding concludes that the Department has not made "reasonable efforts" to eliminate the danger to the child, the court may not dictate to the Department how to administer its discretionary duties. Rather, the court must deny the foster care placement request, as the State in that instance would have failed its substantial burden necessary to override a parent's right to raise his or her child undisturbed.
The question of a court's ability to order the Department to provide housing assistance was squarely addressed in In re the Welfare of J.H., 75 Wash.App. 887, 880 P.2d 1030 (1994), review denied, 126 Wash.2d 1024, 896 P.2d 63 (1995). A mother facing impending eviction from a shelter asked the juvenile court to order the Department to provide her a cash stipend so she could rent an apartment. She was concerned that her children would be placed in foster care if she were to become homeless. The juvenile court ordered the Department to provide the mother with up to $1,200 to cover first and last month's rent, damage deposit, and credit check fee. The Court of Appeals vacated the order, holding that the family court abused its discretion in ordering the Department to expend unappropriated funds.[13]
"[T]he decision to create a program as well as whether and to what extent to fund it is strictly a legislative prerogative." ... Despite the court's broad powers to decide matters affecting its wards, ... the court must limit its incursion into the legislative realm in deference to the doctrine of separation of powers.... The court's order requiring the Department to prove up to $1,200 in cash to secure private housing for this family in order to avert the possibility of foster home placement not only presumes the availability of $1,200 that the Legislature has not appropriated, but also presumes the court's ability to administer an open-ended housing assistance program for similarly situated families.[[14]]
(Footnotes omitted.)
The majority apparently concedes that In re J.H. is good law by vainly attempting to distinguish this case. The majority asserts that In re J.H. "does not hold that a juvenile court lacks authority to determine that `reasonable efforts' may include housing assistance of some kind."[15] The majority is correct. A juvenile court has authority to determine that "reasonable efforts" should include housing assistance. However, as discussed earlier, and as In re J.H. makes clear, even if a juvenile court concludes that the Department's duty to undertake "reasonable efforts" includes a duty to provide housing assistance, the court may not order the Department to provide such housing assistance. Instead, the court must deny the Department's placement request. The Court of Appeals decision in In re J.H. is bolstered by our own recent decision in Hillis v. Department of Ecology, 131 Wash.2d 373, 389-90, 932 P.2d 139 (1997) in which we *1320 held that a court cannot order an agency to perform a duty for which the Legislature has not provided funding.
This is not to say that the courts are powerless to do anything other than deny the placement request. As the In re J.H. court explained:
The court should confront [the connection between homelessness and dependency]... not with the tools of appropriation and administration that are more adapted to the other branches of government, but by means of its authority as a court. The court has indisputable authority over the parties, as well as statutory authority to require that an individualized service plan proposed for a dependent child do a better job of meeting critical needs. The court has the power to compel the attendance in the courtroom of the caseworker, or his or her supervisor, or even the Secretary of the Department, as frequently as necessary until the agency acts with the urgency and effectiveness that the particular needs of the children demand.[[16]]
The Legislature, in enacting RCW 13.34.060, did not authorize the courts to order the Department to provide housing assistance. This is understandable given the degree to which this would intrude into the decisionmaking authority of our coordinate branches of government. Thus, we should hold that the juvenile court in dependency proceedings may not order the Department to provide housing assistance.
B. Nonjusticiable Controversy
Even more troubling than the majority's decision to rewrite this statute is the majority's decision to analyze this issue in the absence of a justiciable controversy. The result is a vague advisory opinion which confuses rather than clarifies the scope of court authority in dependency proceedings.
For declaratory judgment purposes, a justiciable controversy is:
"(1) ... an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."[[17]]
Absent these elements, the court "`steps into the prohibited area of advisory opinions.'"[18]
The majority, without engaging in any analysis, makes the conclusory assertion that each of these factors is met. Yet, there could hardly be a more speculative situation than the present case. In order to have an actual dispute between parties with opposing and direct interests, there would need to be either (1) a child before the court who is currently in foster care placement because of a court's perceived inability to order the Department to provide housing assistance; or (2) a court order in a dependency case directing the Department to provide housing assistance. Were either of these the case, there would be an aggrieved party before the court and the majority would have concrete circumstances around which to frame its analysis. Moreover, courts and litigants in future cases would have a factual context within which to understand what constitutes permissible "housing assistance" and when housing is sufficiently "inadequate" to be a "primary" factor in foster care placement.
Instead, the majority announces a vague advisory opinion. Because there is no actual controversy on this issue before the court, the majority is forced to speculate about the meaning of its new rule.
The form of assistance may vary, depending on the needs of the family, the resources of the Department, and the availability of public and private aid in the community. This assistance could take *1321 many forms. For example, it could include helping a family to find affordable housing by offering transportation, consultation, referrals or assistance in filling out forms; or waiving foster care payments in order to make housing funds available to the family; or providing those funds, when available through the Department; or obtaining housing or assistance from federal, state, local or private agencies.[[19]]
The majority must speculate about the form of housing assistance precisely because there is no actual dispute between parties with direct interests in this matter. The majority does not even bother speculating on how the various needs of families, Department resources, and other resources might affect this calculation. The very reason we have a rule of justiciability is to restrain ourselves from this type of speculation.
Because there was an actual controversy with concrete facts before the court, In re J.H. provides firm guidance to courts and litigants regarding one form of housing assistance that is beyond the court's authority to order. To the extent that the majority would like to clarify the scope of court authority under RCW 13.34, it must wait until a juvenile court's authority is actually challenged in a dependency proceeding. This is not merely a procedural nicety, but a bedrock principle that facilitates predictability in the law. In this way, as more of the possible permutations of family need and outside resources arise in actual controversy, the courts can appropriately mark the limits of court authority in this area of law. Thus, even if juvenile courts were authorized to order housing assistance, the Plaintiffs' claim should be dismissed for lack of justiciability.

CONCLUSION
The majority's disregard of the correct procedural standards of judicial review illustrates why we have such standards in the first place. First, even if the Department has an enforceable duty to plan for homeless children's services, under the APA we may not grant relief absent a showing that the Department's inaction is unconstitutional, unauthorized, or arbitrary or capricious. We certainly may not dictate to the Department the features to be included in such a plan. The purpose of the deferential APA review standards is to avoid the very problem created by the majority, which is forcing an ill-equipped judiciary to assume discretionary legislative functions as the new super-administrator of the State's child welfare plan.
Second, the authority to order the Department to provide housing assistance is beyond the limited powers granted by the Legislature to the juvenile court in dependency proceedings. Moreover, to the extent that a court has any authority to order the Department to provide housing assistance, in the absence of a real controversy with real facts, even the majority is left guessing whether and to what extent a court may order the Department to provide such assistance. The purpose of the justiciability requirement is to avoid the announcement of this sort of vague advisory opinion, which does little if anything to clarify this area of law. We should reverse the trial court's judgment with directions to dismiss the Plaintiffs' claims.
TALMADGE and MADSEN, JJ., concur.
NOTES
[1] The plaintiffs are referred to collectively herein as plaintiffs, Coalition or Homeless Coalition.
[2] These experts included Martha Dilts, former executive director of the Seattle Emergency Housing Service for 17 years and a member of the Governor's task force for homelessness; Barbara Sard, managing attorney of the homelessness unit at Greater Boston Legal Services, former senior attorney for government benefits for Greater Boston Legal Services, a homelessness specialist, and a specialist in federal benefits; Dr. Marybeth Shinn, a professor at New York University in the community psychology doctoral program, and a participant in a major longitudinal study of homeless families and housed poor families in New York City; and Kirk Creager, executive director of the Vancouver (Clark County) Housing Authority, former chief of housing and economic development for King County, and president of the Association of Washington Housing Authorities.
[3] The proposed enhancements focus on minimizing the effect DSHS can have on a family's AFDC grant. Under the first proposed enhancement, when a child is removed from a family receiving AFDC and the plan is for the child to return home within 90 days, DSHS will use state funds for foster care placement rather than requiring the family to make the payment out of its AFDC grant. Under the second proposed enhancement, DSHS would assist families in obtaining AFDC, prior to the child's return, to facilitate the child's return home.
[4] Testimony at trial was that the maximum AFDC benefit that could be paid for a family of three was $546 per month. The average statewide cost for housing, without utilities, for a family of three was $419 per month.
[5] RCW 13.04.030 was amended in both the 1994 and 1995 legislative sessions. Laws of 1994, 1st Spec.Sess., ch. 7, § 519; Laws of 1995, ch. 311, § 15; Laws of 1995, ch. 312, § 39. The amendments did not significantly affect the language of the statute involved here, and the current language is used in this opinion.
[6] This is particularly true where, as here, the claim for declaratory relief is not based solely on RCW 13.34. Plaintiffs in the present case asked for declaratory relief based on an interpretation of RCW 74.13, RCW 74.14A, RCW 13.34, federal law, and state and federal constitutions.
[7] A social worker employed by DSHS testified by affidavit that the parents' procurement of safe and stable housing is a precondition to the return of the children in 90 percent of her caseload. The caseworker testified that DSHS caseworkers are not able to offer any housing assistance to families, even when it would prevent a foster care placement or allow a family to be reunited. Another caseworker testified that he frequently includes the need for adequate housing in the court orders of parents whose children are in foster care and that, in his opinion, if adequate housing were available to caseworkers for use in these cases, reunification would happen earlier and more frequently than it currently happens. Another DSHS caseworker testified that caseworkers are not able to address problems of at-risk families and prevent foster care because, without housing, services or treatment are either inaccessible to the family or ineffective. When the family is homeless, the caseworker is often left with the choice of doing nothing or taking the child into foster care. Former King County Superior Court Judge Terrence A. Carroll testified by affidavit that a family's homelessness or other lack of adequate housing is a significant factor contributing to the need for foster care placement in a substantial number of cases in Washington State and that homelessness prevented or significantly delayed the child's return to the family in a substantial number of cases. Former Judge Carroll also testified that DSHS has not equipped its caseworkers to provide effective housing resources and that caseworkers routinely opposed proposals that the court order such services by asserting that the caseworker lacked the resources.
[1] This rather unimaginative solution demonstrates exactly why courts are ill-equipped to create effective public policy. The majority operates from the premise that homelessness derives from the disappearance of "low cost private housing." There is considerable debate as to the reason we may lack affordable housing. Even if we look beyond the contribution of such factors as mental illness, drug and alcohol abuse, and deinstitutionalization to solely housing issues, there are numerous problems which the majority's solution fails to address. What makes affordable housing rare is not the inaction of the government, but rather actions the government takes that restrict housing availability. "Government action ... does not seem to have much impact on the availability and affordability of housing. Private construction does." William Tucker, The Excluded Americans: Homelessness and Housing Policies 70 (1990). Any action taken by government which provides a disincentive to private housing construction restricts available housing, driving up the cost of the housing that remains, and strands more people who are unable to secure inexpensive housing.

Faced with the dilemma of a general glut of housing in the face of homelessness, many people have argued instead that it is not just housing, but "affordable housing," that is the problem. In a way, the argument begs the question. Housing is housing and the only thing that makes it affordable is if there is plenty of it. Where there is ample housing, as in Phoenix, for example, it is likely to be relatively cheap, even when it is brand-new. Where housing is scarce, on the other hand, as in New York, people will pay remarkably high prices for accommodations that are often remarkably dilapidated.
Thus, to argue that it is not housing but only "affordable housing" that is the core of the dilemma is a bit like arguing that the poor can't get major loans from banks because there is a shortage of "affordable money."
Id. at 22. Any factor that prevents housing developers from realizing a full return on residential construction drives up the cost of housing, discourages new construction, and inevitably results in more homeless people. Governmental actions such as rent control, exclusionary zoning, and impact fees make housing less available and more expensive because they drive up construction costs and restrict supply of building sites unless, of course, our majority thinks it can overrule the law of supply and demandwhich is about as likely as repealing the law of gravity.
[1] RCW 34.05.
[2] See, e.g., Melville v. State, 115 Wash.2d 34, 37-38, 793 P.2d 952 (1990); Aripa v. Department of Soc. and Health Servs., 91 Wash.2d 135, 139, 588 P.2d 185 (1978); In re the Welfare of J.H., 75 Wash.App. 887, 891-92, 880 P.2d 1030 (1994), review denied, 126 Wash.2d 1024, 896 P.2d 63 (1995).
[3] See Def.'s Ex. 1 (State of Washington Child Welfare Plan FY 1994-1997 (Sept. 1993)); Def.'s Ex. 5 (Comprehensive Plan to Coordinate Services for Homeless Children and Families (July 1993)). The latter plan provides for services to homeless children, including case management services, services that prevent or shorten foster care placement, home-based services, family reconciliation services, home support specialists, domestic violence programs, independent living services, street youth programs, foster care placement services, and homeless child care.
[4] RCW 74.13.031(1) requires the Department to provide child welfare services and to develop a plan for "the protection and care of homeless, runaway, dependent, or neglected children." Conceivably, if the statute provides authority to the Department to develop a specific plan to remedy the problems of homeless children, the Department must also remedy the problems of runaway children, dependent children, and neglected children in separate plans. At some point a judge may be asked to determine, in response to litigation brought by groups concerned about the adequacy of services for such affected children, whether these individual plans comply with the statutory mandate.
[5] "The Legislature with its staff and committees is the branch of government better suited to monitor and assess contemporary attitudes than are the courts." CLEAN v. State, 130 Wash.2d 782, 797, 928 P.2d 1054 (1996).
[6] In re the Salary of the Juvenile Director, 87 Wash.2d 232, 240, 552 P.2d 163 (1976) (quoting G. Wood, The Creation of the American Republic, 1776-1787, at 449 (1969)); see also State v. Blilie, 132 Wash.2d 484, 939 P.2d 691 (1997); Carrick v. Locke, 125 Wash.2d 129, 882 P.2d 173 (1994).
[7] Hillis v. Department of Ecology, 131 Wash.2d 373, 381-82, 932 P.2d 139 (1997).
[8] Hillis, 131 Wash.2d at 382, 932 P.2d 139.
[9] Majority at 1307.
[10] See, e.g., Marquis v. City of Spokane, 130 Wash.2d 97, 107, 922 P.2d 43 (1996).
[11] "(8) The court shall release a child alleged to be dependent to the care, custody, and control of the child's parent, guardian, or legal custodian unless the court finds there is reasonable cause to believe that:

"(a) After consideration of the specific services that have been provided, reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home; and
"(b) ...
"(ii) The release of such child would present a serious threat of substantial harm to such child...." RCW 13.34.060(8).
[12] See RCW 13.32A.010: "[A]bsent abuse or neglect, parents should have the right to exercise control over their children.... [T]he family unit is the fundamental resource of American life which should be nurtured and ... should remain intact in the absence of compelling evidence to the contrary."
[13] In re J.H., 75 Wash.App. at 894-95, 880 P.2d 1030.
[14] In re J.H., 75 Wash.App. at 894, 880 P.2d 1030 (quoting Pannell v. Thompson, 91 Wash.2d 591, 599, 589 P.2d 1235 (1979) (citations and footnotes omitted)).
[15] Majority at 1306.
[16] In re J.H., 75 Wash.App. at 895, 880 P.2d 1030.
[17] Walker v. Munro, 124 Wash.2d 402, 411, 879 P.2d 920 (1994) (quoting Nollette v. Christianson, 115 Wash.2d 594, 599, 800 P.2d 359 (1990)).
[18] Walker, 124 Wash.2d at 412, 879 P.2d 920 (quoting Diversified Indus. Dev. Corp. v. Ripley, 82 Wash.2d 811, 815, 514 P.2d 137 (1973)).
[19] Majority at 1295.