[No. 55812-9-I.   Division One.   December 19, 2005.]

*In the Matter of the Detention of* ELMER CAMPBELL, *Appellant.*

*Dennis P. Carroll* and *Mick Woynarowski* (of *The Defender Association*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *David J.W. Hackett, Deputy*, for respondent.

¶1 COLEMAN, J. — Elmer Campbell, civilly committed as a sexually violent predator, proposed a less restrictive alternative (LRA) in Oklahoma, with private supervision to be

funded by the State of Washington. Campbell's proposal provided for supervision by a person available during regular working hours only by telephone. The trial court granted summary judgment in favor of the State. We affirm, as the trial court lacked the authority to order the Department of Corrections (DOC) or the Department of Social and Health Services (DSHS) to fund out-of-state supervision for Campbell. Furthermore, the State established that Campbell's proposed LRA would not meet minimum supervision requirements that would be imposed by the DOC.

## FACTS

¶2 Elmer Campbell was civilly committed as a sexually violent predator in 1994. Years later, the trial court ordered a trial pursuant to RCW 71.09.090 to address an LRA and unconditional release.

¶3 Campbell proposed an LRA with residence at his parents' home in Wewoka, Oklahoma. Jan Farrell, a case manager for the Oklahoma County Mental Health Association, would provide any necessary supervision. Oklahoma Court Services, Inc., provided a letter stating it would "consider" contracting to supervise Campbell. Campbell stated in a written declaration that he was "willing to comply with any requirements" that the court or the DOC would impose. He also stated that he would agree to waive any arguments as to jurisdiction and extradition.

¶4 The State moved for summary judgment against the LRA. The motion included a declaration by Kim Acker, an end-of-sentence-review and civil commitment program manager within the Community Protection Unit of the DOC. In her declaration, Acker stated that the DOC does not have the statutory authority or resources to supervise an LRA placement outside Washington and that it does not have the funds or the authority to pay for a private community corrections officer.

¶5 The State's summary judgment motion also relied on a declaration by Michael Oakley, the assistant deputy

director and general assistant counsel for the Oklahoma DOC. Oakley stated that the Oklahoma DOC does not have jurisdiction or authority to supervise civil detainees and would not agree to supervise Campbell if he were released to live in Oklahoma.

¶6 The State's summary judgment motion also included a copy of the letter provided by Farrell, Campbell's proposed supervisor. The letter states that Farrell worked full-time but would be able to respond to an emergency, check her messages, and return calls on an emergency basis during work hours. The letter also states, "Home visits and collateral contacts will be done during evenings and weekends." The motion also contained a declaration from Henry J. Richards, superintendent of the Special Commitment Center for DSHS, stating that DSHS lacks the statutory authority and the capacity to monitor and supervise Campbell's proposed LRA or to pay a private party to fulfill supervisory responsibilities assigned to the DOC.

¶7 Campbell's response to the State's motion included a copy of a 1998 order for the conditional release of Kaine Gillespie to an LRA in South Carolina. According to the order, Gillespie was to be conditionally released to full-time supervision at a private facility in South Carolina.

¶8 The trial court granted summary judgment for the State. Campbell moved for reconsideration. Documents submitted to the court included a deposition transcript with Acker.

Q. Okay. Generally, what supervision does the Department of Corrections Community Corrections Officers provide for men who are released on Less Restrictive Alternative?

A. They provide extensive supervision, which requires monitoring, things such as GPS, around the clock—the Global Position System monitoring. They require office visits, field visits, job checks, check—you know, meetings with their treatment providers.

Clerk's Papers at 131.

Q. Ms. Acker, is there a base level of supervision that is merited for all 71.09 LRA releases?

A. A base level of supervision?

Q. Yeah. Is there like a, you know, kind of—regardless of individual risk in a particular case, is there a certain minimum level of supervision that you're going to want to see for all these cases?

A. Yeah, well, definitely. I mean, again, like I said, it wouldn't make a difference if somebody was doing really well or really poor. They're all going to be expected to be making field contacts, appointments with the treatment providers, maybe job contacts, you know, various contacts with the offender, yes.

Clerk's Papers at 139-40.

¶9 Acker also stated that community corrections officers could not provide supervision by phone because they have to be able to go to an offender's home if the global positioning system (GPS) does not work and to make sure that the offender is home. Acker additionally stated that LRAs require intensive work by supervisors, and that one supervisor in her office spends all her workweek supervising six offenders (five at a halfway house facility and one in the community), in addition to being on standby 24 hours a day.

¶10 The court record also contained a transcript of a deposition of Richards, the superintendent of the Special Commitment Center (SCC). Richard stated in his deposition that the State had not set aside funds for a private, out-of-state supervisor.

A. [W]e can only work out of the funding that's been provided and allocated for certain purposes. And I don't have the funds for this purpose.

Q. Are you talking about the funds to hire a private community corrections officer?

A. No. Just the whole State allocation for SCC.

Q. So what about the funding relative to Mr. Campbell's LRA was problematic?

A. I don't have a specific funding or funding that would be, in my understanding, in my authority to authorize supporting an out-of-state LRA.

Q. And what funding do you think would be required for an out-of-state LRA?

A. Well, I would expect that there would be an allocation from the budget, State budget, that I would have a line item for out-of-state LRAs.

. . . .

Q. [A]s a superintendent of SCC, are you required to have specific legislative appropriations for specific line item budget items?

A. Yes.

Q. And it, in fact, would be illegal for you to divert funds that the legislature appropriated for one specific purpose to another specific purpose?

A. That's my understanding, it would be illegal to do that.

Q. Okay. And at this point, are there any funds appropriated by the legislature to pay private out-of-state supervision, private CCOs [community corrections officers]?

A. There are no funds for that.

Q. And are there any allocated in the upcoming by [sic] biennium?

A. There are none anticipated or proposed.

Clerk's Papers at 145-47.

¶11 The trial court denied the motion to reconsider and entered agreed findings pursuant to CR 54(b). Campbell appeals.

## ANALYSIS

¶12 Under Washington's sexually violent predator (SVP) statutes, a person civilly committed as an SVP may petition for conditional release to an LRA.[1] RCW 71.09.090(2)(a). If

---

[1] " 'Less restrictive alternative' means court-ordered treatment in a setting less restrictive than total confinement which satisfies the conditions set forth in RCW 71.09.092." RCW 71.09.020(6).

a court determines at a show cause hearing that probable cause exists "to believe that the person's condition has so changed that . . . release to a proposed less restrictive alternative would be in the best interest of the person and conditions can be imposed that would adequately protect the community," the court must set a full hearing. RCW 71-.09.090(2)(c)(ii)(B). If the court sets a full hearing on the issue of whether the person should be conditionally released to an LRA, the State bears the burden of proving beyond a reasonable doubt "that conditional release to any proposed less restrictive alternative either: (i) Is not in the best interest of the committed person; or (ii) does not include conditions that would adequately protect the community. . . . " RCW 71.09.090(3)(c).

¶13 Before the court may direct conditional release to an LRA, it must find that the person satisfies a series of conditions, including the condition that "the person is willing to comply with supervision requirements imposed by the department of corrections." RCW 71.09.092(5). If the court determines that no reasonable jury could find that the conditions of RCW 71.09.092 are satisfied, the court shall grant a motion by the State for a judgment as a matter of law on the issue of conditional release to an LRA. RCW 71-.09.094(1). The court may make this determination during summary judgment proceedings before the RCW 71.09.090 hearing. RCW 71.09.094(1).

¶14 Washington's SVP statutes contain an additional safeguard against the possible danger to the community of the conditional release of a committed person to an LRA. If a court or jury decides that an LRA is in the best interest of the person and would adequately protect the community, the court must still "impose any additional conditions necessary to ensure compliance with treatment and to protect the community." RCW 71.09.096(2). If the court determines that it cannot ensure compliance with treatment and protect the community, "then the person shall be remanded to the custody of the department of social and health services for control, care, and treatment in a secure

facility as designated in RCW 71.09.060(1)." RCW 71-.09.096(2).

¶15 We begin by analyzing Campbell's argument that the trial court has the authority under the sexually violent predator statutes to order DSHS or the DOC to provide funding for his proposed supervision. Campbell argues that under the requirement of RCW 71.09.096(2) that courts impose necessary conditions to ensure compliance and protect the community, courts have the broad authority to order DSHS or the DOC to provide funds for private supervision. Campbell also argues that RCW 71.09.096(3) contemplates the possibility that an entity other than DSHS or the DOC could assume the duty of supervising an LRA. RCW 71.09.096(3) states in part,

> *If the service provider designated* by the court to provide inpatient or outpatient treatment or *to monitor or supervise any other terms and conditions* of a person's placement in a less restrictive alternative *is other than the department of social and health services or the department of corrections,* then the service provider so designated must agree in writing to provide such treatment, monitoring, or supervision in accord with this section. . . .

RCW 71.09.096(3) (emphasis added).

¶16 Campbell also argues that the reasoning of *Washington State Coalition for the Homeless v. Department of Social & Health Services*, 133 Wn.2d 894, 949 P.2d 1291 (1997) supports his claim that a court has the authority to order the State to fund private supervision for LRAs. In *Coalition*, our Supreme Court stated that chapter 13.34 RCW charges juvenile courts with the responsibility for determining whether DSHS has made "reasonable efforts" to prevent or to end foster placements of dependent children. *Coalition*, 133 Wn.2d at 923. Juvenile courts also are required to approve DSHS service plans, "purporting to be based on reasonable efforts, and to incorporate those plans in court orders." *Coalition*, 133 Wn.2d at 923.

¶17 The *Coalition* court further stated that a juvenile court "is able to perform its duties under the statute only if

the statute is interpreted to authorize the court to order DSHS to make reasonable efforts to provide services in the area of need that is the primary reason for the foster placement." *Coalition*, 133 Wn.2d at 923-24. The *Coalition* court held that a juvenile court must have the authority to order DSHS to provide families with assistance in securing adequate housing in cases where homelessness or the lack of safe and adequate housing is the primary reason for the foster placement or the primary reason for its cancellation. *Coalition*, 133 Wn.2d at 924. The court rejected the argument that an order of general housing assistance in dependency cases required a specific appropriation by the legislature because other services, such as counseling or drug and alcohol treatment that are routinely provided under the "reasonable efforts" clause of chapter 13.34 RCW, did not require specific appropriations by the legislature. *Coalition*, 133 Wn.2d at 923.

¶18 Campbell argues that like juvenile courts in dependency proceedings, a trial court considering an LRA can perform its duties under RCW 71.09.096(2) and (3) only if it can order the State to pay for private supervision. Campbell also argues that such an order does not require a specific appropriation by the legislature because the DOC performs other services, such as urinalysis and polygraph testing, without specific appropriations. Campbell also cites for support *In re Detention of J.S.*, 124 Wn.2d 689, 880 P.2d 976 (1994), regarding the statutory scheme set forth in chapter 71.05 RCW governing less restrictive treatment alternatives for persons suffering from mental illness.

¶19 In *J.S.*, the State appealed orders requiring the State to place three civilly committed persons in less restrictive treatment despite the State's claim that placements were not available. *J.S.*, 124 Wn.2d at 691. The Supreme Court noted that the orders did not require placement at a specific facility, only removal from intensive treatment at Western State Hospital. *J.S.*, 124 Wn.2d at 696. The *J.S.* court interpreted chapter 71.05 RCW to provide the trial court with the power to order less restric-

tive treatment instead of remanding to the custody of DSHS if less restrictive treatment was in the best interests of the individuals. *J.S.*, 124 Wn.2d at 698. The *J.S.* court held that the legislature granted the trial court the power to determine the best interests of the individual, including the possibility of less restrictive treatment. *J.S.*, 124 Wn.2d at 699. Because the trial court had the power under the statute to order less restrictive treatment, "it necessarily has the power to compel compliance with its order." *J.S.*, 124 Wn.2d at 699.

¶20 The State contends that chapter 71.09 RCW contains no provision allowing a trial court to order the DOC or DSHS to provide funds for a private supervisor. For support, the State relies on the decision in *In re Welfare of J.H.*, 75 Wn. App. 887, 880 P.2d 1030 (1994). In *J.H.*, the court held that juvenile courts in dependency hearings may not violate the separation of powers doctrine by ordering DSHS to appropriate money in the absence of a legislative appropriation or statutory entitlement. *J.H.*, 75 Wn. App. at 894-95. The *J.H.* court ruled that " '[t]he decision to create a program as well as whether and to what extent to fund it is strictly a legislative prerogative.' " *J.H.*, 75 Wn. App. at 894 (alteration in original) (quoting *Pannell v. Thompson*, 91 Wn.2d 591, 599, 589 P.2d 1235 (1979)). Despite the broad power of a juvenile court in a dependency hearing, "the court must limit its incursion into the legislative realm in deference to the doctrine of separation of powers." *J.H.*, 75 Wn. App. at 894.[2] The State contends that under the reasoning of *J.H.*, a court cannot order the DOC or DSHS to pay for private supervision for Campbell.

---

[2] The *Coalition* court approvingly cited the reasoning of *J.H. Coalition*, 133 Wn.2d at 923. In *Coalition*, DSHS contended that *J.H.* supported its argument that a juvenile court lacked the authority to order it to provide housing assistance to homeless families whose children are placed in foster care primarily because of inadequate housing. *Coalition*, 133 Wn.2d at 900, 923. The *Coalition* court held that *J.H.* stands for the proposition that the particular order appealed in *J.H.* was an incursion into a legislative function and that *J.H.* "does not hold that a juvenile court lacks authority to determine that 'reasonable efforts' may include housing assistance of some kind." *Coalition*, 133 Wn.2d at 923.

¶21 Campbell fails to offer a persuasive argument that courts have the authority under RCW 71.09.096(2) or RCW 71.09.096(3) to order the DOC or DSHS to provide funding for out-of-state supervision. While the legislature left open the possibility in RCW 71.09.096(3) that a court might designate a service provider other than the DOC or DSHS, it is not necessary for a court to designate private, state-funded, out-of-state supervisors in order to provide for the conditional release of SVPs to LRAs when statutory criteria are satisfied. While the legislature charged courts in RCW 71.09.096(2) with the responsibility of imposing "any additional conditions necessary to ensure compliance with treatment and to protect the community," it is not necessary that a court have the authority to order funding for a private supervisor in order to exercise its authority to impose such conditions. *Coalition* is therefore distinguishable.

¶22 *J.S.* is distinguishable as well, because the *J.S.* court made clear that chapter 71.05 RCW represents a legislative mandate for courts to consider LRAs for developmentally disabled adults. While the statutory scheme for LRAs for SVPs contemplates the imposition of conditions and the possibility of supervision by an entity other than the DOC or DSHS, the legislature has not mandated that courts consider State-funded private supervision in order to fulfill its statutory responsibilities.

¶23 We also note that the legislature has not created a program for private supervision to be funded by the State and it has not set aside appropriations for such a program. Under the reasoning of *J.H.*, an order to the DOC or DSHS to provide funding for a private supervisor, in the absence of a legislative appropriation or statutory entitlement, would represent an infringement onto the legislature's prerogative of creating programs and setting their level of funding. Because the court lacked the authority to order the DOC or DSHS to provide funding for private supervision, the court correctly entered summary judgment for the State.

¶24 We next analyze the State's argument that summary judgment was appropriate under RCW 71-.09.094(1) because Campbell's LRA proposal failed as a matter of law to satisfy RCW 71.09.092(5). Under the latter statute, Campbell must be willing to comply with supervision requirements imposed by the DOC. The State argues that Campbell cannot meet this requirement because his proposal does not meet the minimum requirements that the DOC requires for all LRAs. Campbell argues that any factual determination about the appropriate level of supervision should be addressed at trial, not through summary judgment proceedings.

¶25 Acker stated during her deposition that an LRA requires extensive supervision, including office visits, field visits, and job checks, as well as a supervisor's readiness to be on call 24 hours a day for emergencies and for possible problems with the GPS. But Farrell, the proposed supervisor for Campbell, stated that she already works a separate full-time job and that she would be available during working hours only by telephone, except for emergencies. Farrell also stated that she would make home visits and "collateral contacts" only during evenings and weekends. The possible alternative, Oklahoma Court Services, Inc., stated only that it would consider contracting to provide supervision. Although Acker's description of a supervisor's responsibilities are not codified in Washington's SVP statutes, Campbell's proposed LRA would not meet the requirements that the DOC imposes for any LRA. Telephonic supervision by the DOC would fail the requirements for an LRA as well.

¶26 Campbell contends that Gillespie's conditional release to a South Carolina facility indicates that out-of-state LRAs can meet the requirements of the DOC and that the amenability of his proposed LRA is a factual question that should not be determined through summary judgment. But Gillespie's conditional release is clearly distinguishable because it required Gillespie to stay in a supervised 24-hour-a-day facility. If the court determines that no reasonable jury could find that the conditions of RCW 71.09.092

are satisfied, the court shall grant a motion by the State for a judgment as a matter of law. RCW 71.09.094(1). Campbell's inability to satisfy RCW 71.09.092(5) entitled the State to summary judgment under RCW 71.09.094(1).

¶27 Because the trial court lacked the authority to order DSHS or the DOC to provide funding for private supervision and because the conditions of the proposed LRA justified summary judgment under RCW 71.09.094(1), we affirm.

AGID and SCHINDLER, JJ., concur.

Reconsideration denied January 24, 2006.

Review denied at 158 Wn.2d 1007 (2006).