## NOTICE:   SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
AUGUST 11, 2022

_González, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
AUGUST 11, 2022

_Erin L. Lennon_
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 99792-6 |
| | ) | |
| L.C.S., | ) | En Banc |
| | ) | |
| a minor. | ) | Filed: <u>August 11, 2022</u> |
| | ) | |

MADSEN, J.— This case presents the question of what reasonable efforts the Washington State Department of Children, Youth, and Family (Department) must make before a child may be removed from the care of his/her parent guardian. In this case, a child was taken from his mother after she brought him to the hospital, where hospital staff found he had serious injuries. At the subsequent shelter care hearing, the father, who lives separately from the mother, asked that the child be placed with him. The Department recommended out-of-home placement, citing concern for the child's safety. The court determined the child should be placed with his godparents, based on the Department's recommendation. The father moved for discretionary review of the shelter care order, arguing the court erred because the Department failed to make reasonable

No. 99792-6

efforts to prevent removal from a parent. The commissioner of Division One of the Court of Appeals denied review, and a panel of the court declined to modify its ruling. The father then filed a motion for discretionary review in this court, which we granted.

The issue before the court is moot, as the father in this case agreed to an order of dependency in a subsequent hearing. However, given the substantial public interest involved in keeping families together and the potential that this issue will further evade review, we took review of this case. The Department argued, and the trial court agreed, that given the acute and emergent circumstances of the case, it did not violate the reasonable efforts requirement. The father argued that there is no such exception for emergent circumstances.

We take this opportunity to clarify that there is no exception to the reasonable efforts requirement. Further, we provide additional guidance as to what constitutes reasonable efforts, given the lack of case law on the standard in our state. Although we need not remand the case given its mootness, we nonetheless reverse and hold that the trial court erred when it excused the Department from making reasonable efforts to place the child with his father.

BACKGROUND

D.S. is the father of L.C.S. Born in 2018, L.C.S. was diagnosed with autism and speech and language delays. L.C.S. lived with his mother, but D.S. would visit periodically and engaged in video visits. By May 2020, L.C.S.'s mother began dating another man and stopped allowing D.S. to see L.C.S.

2

No. 99792-6

On August 8, 2020, the mother took L.C.S. to the emergency room because he was vomiting. L.C.S. had bruises on his leg, lower back, and right ear. Child Protective Services sent a social worker, Raena Lorio, and a sheriff's deputy to visit L.C.S. at his mother's home. During the visit, it was reported that D.S. had been violent with the mother and that he was not involved in parenting L.C.S. Lorio submitted L.C.S.'s medical records and photos of his injuries to Seattle Children's Hospital for a medical consultation. The next day, the consulting pediatrician expressed concern that bruising around L.C.S.'s ear seemed likely to be an inflicted injury, as opposed to an accident as the mother had suggested.

On August 23, the mother brought L.C.S. to the hospital again because of bruising and lethargy. At that time, L.C.S. tested positive for amphetamines and opiates. He also had over 50 separate injuries, including bruising, cuts, scratches, swelling, and burn marks. According to the medical staff, none of the explanations provided by the mother or maternal grandmother explained the injuries. Because of the extent of the injuries, the hospital placed L.C.S. on medical hold and transferred him to Harborview Medical Center, where he underwent a full evaluation by Seattle Children's Safe Child and Adolescent Network.

The next day, Lorio and another social worker, Victoria Cantu, spoke with D.S. D.S. told them that he did not have a working car. He also shared that he was unemployed due to a physical disability and that he was taking muscle relaxers for his back pain and antidepressant medication for depression and anxiety. He told the social

3

No. 99792-6

workers that he had not seen L.C.S. since May 2020 because the mother did not want D.S. around. The social workers also spoke with L.C.S.'s half-sister, S.A., who told them that the mother's boyfriend was with L.C.S. the day that he was injured. S.A. also told Lorio that D.S. had previously threatened her mother.

On August 25, the Department held a Family Team Decision Meeting to discuss placement options. D.S. was on the call, but his phone connection cut in and out, hindering his ability to participate in the meeting. The mother requested that L.C.S. be returned to her care or, alternatively, that he be placed with D.S.

That same day, the Department filed a dependency petition for L.C.S. The Department requested a shelter care hearing and continued out-of-home placement for L.C.S. due to concerns of physical abuse and negligent treatment in the home.

A shelter care hearing was held the following day. D.S. asked that L.C.S. be placed with him. The mother requested L.C.S. and S.A. be placed with their godparents. The Department requested an out-of-home placement, expressing concern that there was a serious threat of substantial harm if L.C.S. was returned home.

Cantu testified that the Department was not considering D.S. for placement because it had not had the opportunity to fully assess his ability to be a safe parent. Cantu also noted that D.S. did not have a phone or transportation at that time. She also mentioned his physical impairments, expressing concern that these might affect his ability to be a safe placement. Lorio testified that she had not contacted D.S. about either L.C.S.'s initial incident or the second hospitalization. She also had not done a walk-

4

through of D.S.'s home. She testified that the Department had not yet performed a background check on D.S. and had not offered D.S. any services to help with his potential lack of transportation. Lorio also stated that she had not investigated the mother's claims about domestic violence.

After the testimonies of the social workers, D.S. asked the court to find that reasonable efforts had not been made and that L.C.S. should be placed with him. In response, the Department stated it had made reasonable efforts as to the mother and that it was too early to consider the father for placement. The Department also reiterated concerns about domestic violence between D.S. and the mother as well as his ability to care for L.C.S. given D.S.'s physical disabilities.

The court decided to place L.C.S. with Aaron Fonceca and Vanessa Gliege Fonceca, who are L.C.S. and S.A.'s godparents. Aaron Fonceca did not pass his background check. Nonetheless, the court heard testimony from Aaron Fonceca and determined the godparents would be the best placement. In its ruling, the court stated that "it would be nice if the father had been more thoroughly investigated between 8/24 and 8/26 as a potential placement for [L.C.S.], but obviously that didn't happen." 1 RP[1] at 40. The court determined that given the extreme injuries sustained by L.C.S., there was need for decisive action to ensure he was safe. The court directed the Department to make reasonable efforts to assist D.S. to allow L.C.S. to return to his care. In the shelter care hearing order, the court noted that "under the emergent and acute circumstances in

---

[1] The parties cite to the report of proceedings from the initial shelter care hearing on August 26, 2020, as 1 RP. We have used the same citation here for consistency's sake.

5

this [case] there were no reasonable efforts the Department could have taken to keep the child in the home while ensuring his safety and protecting him from substantial harm." Clerk's Papers at 4.

On December 15, 2020, D.S. moved for interlocutory review of the shelter care hearing order. Commissioner Masako Kanazawa of Division One of the Court of Appeals denied discretionary review, holding that the evidence presented supported the finding that releasing L.C.S. to either parent would present substantial harm and that the emergent and acute circumstances excused the Department from reasonable efforts. The Court of Appeals denied D.S.'s motion to modify the commissioner's ruling. D.S. then filed a motion for discretionary review in this court, which we granted. Order, No. 99792-6 (Wash. Sept. 3, 2021).

On March 21, 2021, D.S. stipulated to an agreed order of dependency and disposition, agreeing that the Department had made reasonable efforts, that there was a need for decisive action in order to protect L.C.S. from further abuse, and that L.C.S. should remain in out-of-home care, rendering the shelter care issue moot.

ANALYSIS

1. Mootness

A case is moot when the appellate court can no longer provide effective relief. *State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995). Generally, we will not review a moot case. *Orwick v. City of Seattle*, 103 Wn.2d 249, 253, 692 P.2d 793 (1984). But we may review a moot case if the contested issue is a matter of continuing and

No. 99792-6

substantial public interest. *In re Marriage of Homer*, 151 Wn.2d 884, 891, 93 P.3d 124 (2004). In deciding whether a case presents an issue of continuing and substantial public interest, this court considers the following factors: whether the issue is of public or private nature, whether an authoritative determination is desirable to provide future guidance, and whether the issue is likely to reoccur. *Id.* at 892. The court may also consider the adverseness of the parties, the quality of the advocacy, and the likelihood that the issue will escape review. *Id.*

Here, the case is public in nature given the impact such decisions may have on family relationships. A determination will also provide guidance to future courts facing the issue, especially given the lack of judicial opinions on the reasonable efforts standard. This is an issue that commonly arises in dependency hearings. Finally, in dependency hearings, one of the goals is to provide permanency for the child. One potential result of a lower court determination that the Department has met its duty to make reasonable efforts is removal from the parents. This decision has long-term implications for the child, and so it is crucial that lower courts are applying the standard correctly. In addition, given the quick time frame between the initial shelter care hearing and subsequent hearings, future cases on this issue are likely to evade review.

For these reasons, we proceed to the merits of this case despite the fact that the issue is moot.[2]

---

[2] Our courts have previously ruled on cases involving procedural errors at shelter care hearings despite the fact that those cases were moot given the substantial and continuing public interest and likelihood that such issues would evade review. *See In re Dependency of T.P.*, 12 Wn. App. 2d 538, 458 P.3d 825 (2020); *In re Dependency of H.*, 71 Wn. App. 524, 859 P.2d 1258 (1993).

7

No. 99792-6

2. <u>Reasonable Efforts and Emergent Circumstances</u>

Given their fact-based nature, placement decisions in a dependency proceeding are discretionary and will be overturned only upon a showing of abuse of discretion. *In re Dependency of A.C.*, 74 Wn. App. 271, 275, 873 P.2d 535 (1994). An error of law necessarily constitutes an abuse of discretion. *Sales v. Weyerhauser Co.*, 163 Wn.2d 14, 19, 177 P.3d 1122 (2008). Here, the parties disagree over whether the lower court properly applied RCW 13.34.065(5)(a)'s reasonable efforts requirement.

The meaning of a statute is a question of law reviewed de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). The statute at issue, RCW 13.34.065(5)(a), states:

> The court shall release a child alleged to be dependent to the care, custody, and control of the child's parent, guardian, or legal custodian unless the court finds there is reasonable cause to believe that:
> (i) After consideration of the specific services that have been provided, reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home; and
> (ii)(A) The child has no parent, guardian, or legal custodian to provide supervision and care for such child; or
> (B) The release of such child would present a serious threat of substantial harm to such child, notwithstanding an order entered pursuant to RCW 26.44.063; or
> (C) The parent, guardian, or custodian to whom the child could be released has been charged with violating RCW 9A.40.060 or 9A.40.070.[3]

---

[3] The legislature passed an amendment to this statute, changing the language in RCW 13.34.065(5)(a)(ii)(B). The updated statute, effective July 2023, updates the somewhat vague "substantial harm" language to more clearly define when removal is necessary and appropriate to prevent imminent physical harm.

8

No. 99792-6

This statute was enacted to conform to federal law governing services for children in foster care. *Wash. State Coal. for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 919, 949 P.2d 1291 (1997). Congress first adopted the "reasonable efforts" requirement in the Adoption Assistance and Child Welfare Act of 1980 (AACWA), Pub. L. No. 96-272, § 101(a)(1), 94 Stat. 500, 501. Kathleen S. Bean, *Reasonable Efforts: What State Courts Think*, 36 U. TOL. L. REV. 321, 321 (2005). Under this law, states are required to make reasonable efforts to prevent or eliminate the removal of a child from their home in order to receive federal funding for child welfare services. *Id.*

Congress amended the reasonable efforts statute in 1997 as part of the Adoption and Safe Families Act (ASFA). *See* 42 U.S.C. § 671(a)(15). The updated version emphasizes that a child's safety is the paramount concern and excuses states from requiring reasonable efforts under aggravated circumstances. *Id.*; *see* Will L. Crossley, *Defining Reasonable Efforts: Demystifying the State's Burden under Federal Child Protection Legislation*, 12 B.U. PUB. INT. L.J. 259, 279-82 (2003) (explaining the amendments to the federal reasonable efforts statute). However, Congress declined to define "reasonable efforts" in both the initial legislation and the subsequent amendments, despite requests from various advocates. Crossley, *supra*, at 280.

The amendment was passed out of growing concern that the reasonable efforts standard in AACWA encouraged states to go too far to preserve family relationships, such that children were being placed in unsafe situations. Bean, *supra*, at 326. Importantly, it gave states flexibility to excuse reasonable efforts under certain

9

No. 99792-6

aggravated circumstances. *Id.* at 327. Our legislature added language to the shelter care hearing statute in 2007, emphasizing that the "paramount consideration for the court shall be the health, welfare, and safety of the child." RCW 13.34.065(4); Engrossed Substitute H.B. 1624, at 11, 60th Leg., Reg. Sess. (Wash. 2007).

This past year, the legislature passed additional amendments, set to take effect in July 2023, that more precisely define when removal to prevent imminent physical harm is necessary. Engrossed Second Substitute H.B. 1227, 67th Leg., Reg. Sess. (Wash. 2021) (amending, among other things, RCW 13.34.065(5)(a)(ii)(B)). These amendments were an attempt to limit removal to circumstances that present a risk of imminent physical harm. The updated language emphasizes that removal is appropriate only to prevent "imminent physical harm," and that disability and special needs of the parent or child, among other things, do not alone constitute imminent physical harm. Engrossed Second Substitute H.B. 1227, § 9, at 13-14. When first introducing the bill, which is titled "the keeping families together act," one of the bill's sponsors stated the "intent of the bill is to have more eyes on the removal process" to ensure that the situation merits removal before taking children from their parents. Hr'g on H.B. 1227 Before the H. Child., Youth & Fams. Comm., 67th Leg., Reg. Sess. (Wash. Jan. 20, 2021), *video recording by* TVW at 1 hr., 10 min., Washington State's Public Affairs Network, https://tvw.org/video/house-children-youth-families-committee-2021011327/?eventID=2021011327.

10

No. 99792-6

D.S. argues that there is no language in this statute excusing the Department from making reasonable efforts. He points to other statutes that apply to the dependency process that do excuse reasonable efforts in certain situations. Br. of Pet'r at 29 (citing RCW 13.34.132, .130(6)). The Department argues that a case-by-case analysis is necessary to provide the Department the flexibility to ensure the child is safe. Essentially, the Department argues that any bright line rule requiring reasonable efforts in every case ignores the fact that there will sometimes be circumstances where few or no services are reasonable.

Under a plain reading of the statute, we agree with D.S. that there is no exception to the reasonable efforts requirement. The statute states that the child *shall* be placed with a parent unless reasonable efforts have been made to prevent removal and one of the conditions under RCW 13.34.065(5)(a)(ii) has been met.

In this case, the Department argues that given the short time frame and the imminent concerns about L.C.S.'s safety, the court was correct when it excused them from making reasonable efforts. However, most of the Department's arguments focus on the efforts made as to the mother and not the father. The Department acknowledges that it "could have investigated the father more thoroughly" but argues that the social workers did not have time to do so given "numerous other obligations in the case competing for their attention." Br. of Resp't at 37-38. However, the Department does not explain the reasonable efforts it made as to the father; instead, it provides reasons that justify its failure to do so.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

First, the Department argues that placement with the father would compromise L.C.S.'s health and safety. To support this argument, it points to the fact that the father had no transportation, lived far away, and had been accused by the mother of domestic violence in the past. But the Department did not offer any services to help with the transportation issue, and it did not investigate the domestic violence claims to determine if they had any merit. In contrast, the Department did perform background checks on all three of the adults who lived at the other potential placement option.

Next, the Department argues that it tailored its efforts to the individual needs of the family and considered what services might be helpful. Although the Department did take steps to ensure the child's safety, notably absent from those steps are any efforts as to the father. As the Department itself notes, "Though the services offered to the father were limited, the Department's efforts were diligent." *Id.* at 40. The Department may have acted diligently to determine alternate placements for L.C.S., but it failed to make any efforts to determine whether the father could be a viable placement option.

Finally, the Department concedes that it is not clear from the record that any services were offered to the father. But the Department argues that these services could not have been completed in the time before the shelter care hearing. Essentially, the Department argues that it was excused from performing any assessments or offering any services given the emergent circumstances.

In sum, given limited resources and a short time frame before the shelter care hearing, the Department repeatedly emphasizes that it needs a flexible standard to help

No. 99792-6

ensure the child's safety. We agree with the Department that a flexible standard is needed. However, a flexible standard does not excuse the Department from making no efforts to maintain placement with a parent, as it did here. The Department presumed the father was an unfit placement and moved on to other options without conducting any assessments to determine whether he was fit. There may be cases where an investigation makes it clear that under no circumstances would it be safe to leave the child with the parent. *See* Br. of Pet'r at 52. But, when determining whether or not the Department has made reasonable efforts, the court must look at the Department's efforts toward placement with both parents. In this case, although the Department made efforts toward placement with the mother, it failed to make any efforts to determine if D.S. could be an appropriate placement for L.C.S.

We reject the creation of an explicit exception for emergent or acute circumstances. Creating such an exception is not contemplated by the statute and would give the Department too much discretion to immediately consider removal options without first making reasonable efforts to determine if continued placement with either parent is possible.

3. <u>Applying Reasonable Efforts</u>

We also take this opportunity to provide additional guidance to assist lower courts in applying the reasonable efforts standard given the lack of decisions in our state defining the term.

13

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99792-6

Initially, if the trial court concludes the Department has made reasonable efforts, it must make findings on the record to support its conclusion. Checking a box is not sufficient to protect the interests involved or to provide the information necessary for review. In making these findings, the court must consider whether or not reasonable efforts have been made for each parent. In situations such as this one, where the parents live separately, each parent must be considered individually and reasonable efforts should be made for both parents before the Department considers other options.

In determining whether reasonable efforts have been made, the court should consider the facts and circumstances of each parent. Efforts required at the shelter care hearing may differ from those at dependency and may differ based on the circumstances of each parent. The Department is tasked with the difficult job of balancing family stability and child safety, often in a short amount of time. We understand a flexible standard is necessary to allow the Department to balance these concerns given limited time and resources.

Both federal guidance and other states' applications of the standard are instructive and provide helpful guidelines for applying the reasonable efforts standard. In considering these examples, we highlight the two main concerns that the Department is required to balance: child safety and family stability.

As noted above, Congress declined to explicitly define reasonable efforts, leaving it instead to the states to decide how to apply this standard. According to the United States Department of Health and Human Services (DHHS), "any regulatory definition

14

No. 99792-6

would either limit the courts' ability to make determinations on a case-by-case basis or be so broad as to be ineffective." Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 63 Fed. Reg. 50,058, 50,073 (Sept. 18, 1998). Nonetheless, DHHS did offer overarching considerations to help guide the reasonable efforts inquiry:

- Would the child's health or safety have been compromised had the agency attempted to maintain him or her at home?
- Was the service plan customized to the individual needs of the family or was it a standard package of services?
- Did the agency provide services to ameliorate factors present in the child or parent, i.e., physical, emotional, or psychological, that would inhibit a parent's ability to maintain the child safely at home?
- Do limitations exist with respect to service availability, including transportation issues? If so, what efforts did the agency undertake to overcome these obstacles?
- Are the State agency's activities associated with making and finalizing an alternate permanent placement consistent with the permanency goal?[4]

*Id.*

The first factor ensures the child's safety is not compromised if there are serious health or safety concerns at home. When considering this factor, the court should also consider the harm of removal. Removal carries long-term risk of serious emotional and psychological harm to the child. *See* Shanta Trivedi, *The Harm of Child Removal*, 43 N.Y.U. REV. OF L. & SOC. CHANGE 523, 527-41 (2019). It is important that courts consider not only the potential harm of remaining at home but also the trauma and harm that may come from removal. *See* Vivek Sankaran, Christopher Church & Monique Mitchell, *A Cure Worse Than the Disease? The Impact of Removal on Children and*

---

[4] Reasonable efforts may look different at different steps of the process. This fifth factor may not be relevant in the short time frame before the shelter care hearing, but it may be an important consideration at permanency planning and termination hearings.

15

*Their Families*, 102 MARQ. L. REV. 1161, 1165-71 (2019) (detailing the traumas associated with removal and placement in foster care).

The other factors require the Department to make an individualized plan tailored to the family's needs and focused on providing any services necessary to help overcome obstacles that might prevent the child from maintaining placement at home. Although the child's safety is of paramount concern, a perceived safety risk is an insufficient reason to excuse reasonable efforts. As the third factor emphasizes, reasonable efforts require the Department to provide services to ameliorate any safety concerns it may have, if possible.

Our legislature has also declined to define reasonable efforts. It has, however, provided a list of services that may be offered to the family, including family counseling, substance abuse treatment services, mental health services, assistance to address domestic violence, temporary child care, and transportation. RCW 13.34.025. This nonexhaustive list can also guide lower courts as they determine whether the Department has taken sufficient action to meet the reasonable efforts requirement.

Each state has its own version of a "reasonable efforts" statute in compliance with the federal requirement. Some statutes adopted statutory language nearly identical to ASFA, while others have added additional context to the reasonable efforts requirement. For example, many states require reasonable efforts be accessible, available, and appropriate. *See, e.g.*, WYO. STAT. § 14-3-440; N.H. REV. STAT. § 169-C:24-a. Other states emphasize care and diligence. *See, e.g.*, ARK. CODE ANN. § 9-27-303; COLO. REV. STAT. § 19-1-103(114); FLA. STAT. §39.521(1)(g). Some require a service plan detailing

16

No. 99792-6

the services to be provided. *See, e.g.*, DEL. CODE ANN. title 29, § 9003; IDAHO CODE § 16-1621(1). Commonly used terms include "family reunification," "family preservation," "family support," and "preventive services." *See* CHILD.'S BUREAU, U.S. DEP'T OF HEALTH & HUMAN SERVS., REASONABLE EFFORTS TO PRESERVE OR REUNIFY FAMILIES AND ACHIEVE PERMANENCY FOR CHILDREN 2 (detailing the reasonable efforts statutes from different states), https://www.childwelfare.gov/pubpdfs/reunify.pdf. Although the statutes vary state by state, every state law emphasizes in some manner the goal of family preservation while also protecting the child's safety.

In Washington, the Department provides similar guidance for social workers as to what reasonable efforts are required. *See Reasonable Efforts*, WASH. DEP'T OF CHILD., YOUTH & FAMS., https://www.dcyf.wa.gov/4300-case-planning/4304-reasonable-efforts. Similar to other state statutes, the department guidance also emphasizes that the services must identify safety threats, be culturally appropriate, be geographically accessible, and be tailored for any parents with developmental disabilities.

We do not intend to draw a bright line rule defining what "reasonable efforts" are. Our legislature recently amended the shelter care hearing statute but opted not to define reasonable efforts. We agree with both parties in this case that flexibility is crucial for the Department. Instead, we highlight and emphasize the goals of the reasonable efforts statute—child safety and family preservation. We leave discretion to the lower courts to determine on a case-by-case basis if the Department has made reasonable efforts, but we

17

require that courts make clear on the record what actions were taken to support a finding that the Department has met that standard.

CONCLUSION

As the legislature's recent amendments emphasize, it is crucial that children are protected from imminent physical harm. But absent the risk of such harm and given the serious long-term trauma that removal may cause, the Department is required to make reasonable efforts toward both parents to prevent removal whenever possible. In this case, although the Department made reasonable efforts to maintain placement with the mother, it failed to do so for the father, citing emergent circumstances. The Department is required to make reasonable efforts for both parents. We reverse the trial court shelter care order and hold that there is no exigent circumstances exception to the reasonable efforts requirement.

_____
Madsen, J.

WE CONCUR:

_____
González, C.J.

_____
Gordon McCloud, J.

_____
Johnson, J.

_____
Yu, J.

_____
Owens, J.

_____
Whitener, J.

_____
Stephens, J.

_____
Siddoway, J.P.T.

19